**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                             CRIMINAL ACTION NO. 2:09-cr-00222

DAVID KEITH BARBEITO et al.,

        Defendants.

**MEMORANDUM OPINION**

The purpose of this Memorandum Opinion is to resolve a number of outstanding legal questions which have become impediments to the orderly progression of this case.

*I. BACKGROUND*

A forty-four-count indictment was returned on September 29, 2009, against fifty-five members or associates of the Pagans Motorcycle Club (PMC). The indictment was the culmination of a lengthy investigation of the PMC. It alleges that Defendants committed a variety of offenses, including racketeering, violent crimes in aid of racketeering, interstate travel in aid of racketeering, drug distribution, and unlawful firearm possession, between approximately March 2003 and October 2009. A twenty-nine-count superseding indictment was returned fon February 2, 2010.[1] The charges in the superseding indictment are substantially the same as the original indictment,

---

[1] Except where otherwise indicated, references to the "indictment" or enumerated counts refer to the superseding indictment. Defendants who have pled guilty to counts in the original indictment and are not charged in the superseding indictment will be discussed in conjunction with the corresponding counts of the superseding indictment.

containing few substantive changes to the counts.  It does not include charges against Defendants who have entered guilty pleas to counts in the original indictment, but it does charge an additional Defendant.

The advancement of this case toward an eventual trial has been fitful at best.  It has now reached an impasse.  Large-scale racketeering prosecutions of this nature are rare in this circuit, and almost unheard of in this district.  Defendants have asserted numerous disagreements with the Government's interpretation of the relevant statutes.  Other pertinent legal questions have been raised by the Court.  There is no clearly established mandatory authority for many of these questions.  Understandably, given the number of Defendants in this case, these issues have arisen and been addressed in a piecemeal fashion.  It is injudicious, however, to resolve such questions as to one Defendant if the resolution will affect others who have had no say in the matter.  This point takes on added significance where, as here, the interests of various Defendants may not be aligned.

The events that have led to this point bear recounting.  Shortly following the unsealing of the original indictment, a number of Defendants elected to enter guilty pleas in conjunction with plea agreements.[2]  As has become a common practice in this district, the plea agreements were accompanied by signed stipulations of facts.  The purpose of the stipulations is to establish on the record the factual basis for the guilty plea.  Consistent with this Court's practice for nearly two years, and with the parties' assent, the Court relied on the stipulations of facts for the purpose of

---

[2]  Defendant Steve Harlan Stover is the lone exception.  He pled guilty but did not enter into the standard plea agreement that has become common in this district.  He, his attorney, and an Assistant United States Attorney did sign a joint stipulation of facts, however, "for the limited purpose of establishing a factual basis for the defendant's guilty plea."  (Docket 664.)

finding that there was an adequate factual basis for the guilty pleas.  Defendants' guilty pleas were accepted but the Court deferred adjudging the Defendants guilty until the time of sentencing.

The Court had never encountered a problem with these factual stipulations and had come to rely on the Government and defense counsel to arrive at appropriate stipulations for this purpose. Further, in the early days of this case, the Court had not yet become familiar with the complex and uncertain tangle of legal issues that has emerged.  Therefore, the factual basis findings were made without critical dissection of the law and stipulations.  Having thus taken some responsibility for the circumstances leading to this opinion, the Court remains baffled by the lack of critical evaluation of these stipulations by counsel, especially counsel for Defendants who have entered guilty pleas, both before the pleas and after, but especially since these issues have become evident.

Fortunately, these problems became apparent before it was too late.  On December 4, 2009, Defendant Thomas Morris appeared before the Court to enter a guilty plea to Count Seven of the original indictment, which charged him with a conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5).  The Court expressed reservations at the hearing as to whether the elements were adequately supported by the stipulation of facts attached to Morris's plea agreement.  Upon reviewing the proposed factual basis in more detail after the hearing, the Court concluded that the stipulation of facts appeared to expressly negate the intent element of the offense. The Court therefore rejected the guilty plea for lack of a factual basis at a subsequent hearing.[3] (Docket 840.)

---

[3] Morris later pled guilty to an information charging an offense based on a different set of facts. (Docket 972.)

Morris was not the only defendant in this case to appear for a plea hearing that was thwarted due to the lack of an adequate factual basis in the record. Defendant Joseph Schmidt appeared on March 9, 2010, to enter a guilty plea to Count Eleven of the superseding indictment, which charged him with violating 18 U.S.C. § 1952(a)(1) and § 2. Again, the Court expressed concerns about the proposed factual basis as set forth in the stipulation of facts. It was unclear from the stipulation what actions were attributable to Schmidt. Upon being questioned by the Court about the facts, Schmidt presented a scenario seemingly at odds with the stipulation. Notwithstanding that he had previously signed the plea agreement and the attached stipulation of facts, Schmidt proceeded to disavow the stipulation and withdraw his intention to enter a guilty plea. To be fair, the stipulation was not factually incorrect. However, several of its statements were ambiguous. The Court was troubled by Schmidt's representations at the plea hearing when compared with the stipulation of facts.

The abortive plea hearings of Morris and Schmidt caused the Court to take the unprecedented action of reviewing with a critical eye the factual bases for some of the guilty pleas that have been entered in this case. This review is consistent with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, which provides: "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Serious questions regarding the sufficiency of these factual bases arose as a result of this critical review. There are three plausible causes for the insufficient factual bases. The first is benign oversight or inattentiveness to detail when drafting the stipulations of facts. The second and more troubling possibility is that the necessary facts did not exist and Defendants had pled guilty to offenses that did not correspond to their actions. The third possible cause is that the guilty pleas were based on debatable interpretations of the relevant statutes.

4

Ascertaining the correct interpretation of the law is the first order of business as the law provides the standard by which the facts in the record are to be measured. For some Defendants, the Court directed the parties to file memoranda addressing the essential elements of the offenses to which the Defendants had pled guilty. It became obvious from those memoranda that the interests of a Defendant who has signed an agreement admitting an offense and waiving Rule 410 of the Federal Rules of Evidence are not all that dissimilar from the Government with respect to the interpretation of the law. Joint briefing from the Government and a Defendant may gloss over or ignore thorny legal questions that likely would be the focus of a truly adverse party, such as those Defendants who are proceeding to trial. Furthermore, the Court's decisions about the law for the purposes of finding factual bases for the guilty pleas inevitably would impact other Defendants charged in the same counts who had not entered guilty pleas.

Further complicating the issue, other Defendants had been filing motions to dismiss the indictment challenging the Government's interpretation of the law. The Court heard argument on these motions on April 15, 2010. Many of these motions identify additional questions of unsettled law that had not been addressed by any party in the context of establishing the factual bases for guilty pleas. Most of these motions have been resolved without reaching the issue of what the Government ultimately must prove at trial to obtain convictions. Those questions remain outstanding and must be resolved prior to trial.

On May 4, 2010, the Court held a hearing in which all parties, including those who had entered guilty pleas, were invited to discuss and attempt to resolve the types of legal questions that typically would arise in anticipation of a Rule 11 plea hearing or when fashioning jury instructions. Although this hearing was unorthodox, it was necessary. It is evident that this case cannot proceed

5

until all parties have the same working understanding of the legal standards this Court will apply when evaluating guilty pleas or approving jury instructions.  Thus, after considering the input of counsel, the Court finds it appropriate at this juncture to clarify the interpretation of certain counts charged in this case and the standard by which this Court will assess proposed guilty pleas.  This should benefit those Defendants who have entered guilty pleas, those who are contemplating entering guilty pleas, and those who intend to proceed to trial.

The Court's findings are set forth below.

## II.  FACTUAL BASIS STANDARD

Before a court may enter judgment on a guilty plea, it must be satisfied that a factual basis for the plea has been established.  Fed. R. Crim. P. 11(b)(3); *see also Santobello v. New York,* 404 U.S. 257, 262 (1971) (noting that it is within a court's discretion to accept or reject a proposed guilty plea).  The purpose of this requirement is to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge."  *United States v. Mastrapa*, 509 F.3d 652, 660 (4th Cir. 2007).  To effectuate this purpose, Rule 11(b)(3) demands fidelity to the letter of the law.  It is not sufficient that the defendant has engaged in some criminal activity that bears a resemblance to the offense charged; the Court must ensure that the facts establish each element of the crime with which the defendant is charged.  *McCarthy v. United States*, 394 U.S. 459, 467 (1969).  The Court's inquiry is not limited to the facts asserted at the defendant's plea colloquy.  The factual basis for the offense can be established by reference to any evidence or information in the record.  *Mastrapa*, 509 F.3d at 660.  A court therefore may defer its finding of a factual basis for the plea until the time of

sentencing.  *United States v. Martinez*, 277 F.3d 517, 522 n.4 (4th Cir. 2002); *United States v. Moffitt*, 527 F. Supp. 2d 474, 478 n.2 (E.D.N.C. 2006).

There is no per se standard for establishing the factual basis for an offense.  As stated by the Fourth Circuit:

> In order to comply with Rule 11(f) [now Rule 11(b)(3)], a district court need not replicate the trial that the parties sought to avoid.  Rather, it need only be *subjectively satisfied* that there is a sufficient factual basis for a conclusion that the defendant committed all of the elements of the offense.  The district court possesses wide discretion in determining whether a sufficient factual basis exists . . . .

*United States v. Mitchell*, 104 F.3d 649, 652 (4th Cir. 1997) (emphasis added); *see also United States v. Henry*, 459 F. Supp. 199, 200 (E.D.N.Y. 1978) ("In [the Court's] search for truth, [it is] as much a fact finder when taking a guilty plea as we are when rendering final judgment in a case tried to the Court.").

The principle followed by the undersigned is that there must be some undisputed factual assertion in the record that supports each element of the offense.  This is by no means an onerous burden.  The record need not prove each element beyond a reasonable doubt, but each element must be directly addressed.  Conclusory statements that simply repeat statutory language without more will seldom be sufficient.  Moreover, the Court will not infer that an essential element has been established if no factual assertion in the record directly supports such a conclusion or if only vague assertions are made which generate uncertainty as to the factual basis.  Finding that there is an adequate basis in fact for a proposed guilty plea should not be an exercise in textual interpretation.  Rule 11(b)(3) requires greater attention to detail, especially where the parties prepare a joint stipulation of facts to establish the factual basis for an offense.

Joint stipulations of facts often serve a useful function at Rule 11 hearings. Alternative methods of establishing a factual basis, namely proffers, testimony, or inquiry of the defendant, carry a risk of surprise that, in rare circumstances, could stall the hearing—a defendant may take issue with the Government's proffer or a witness or defendant may make unexpected statements. Joint stipulations permit the Government to work with a cooperative defendant to present the necessary facts in a deliberate manner, resolving any disputes or factual deficiencies in advance of the Rule 11 hearing. It is for this reason that the omission of facts supporting any element of the offense is all the more glaring; it gives rise to the inference that such facts may not exist. When the parties proceed as they have in this case, by submitting a joint stipulation of facts for the purpose of establishing the factual basis for a guilty plea, there is little excuse for the failure to plainly and directly address a factual assertion to each element of the offense.

### III. RICO

Count One of the indictment charges Defendants with engaging in racketeering in violation of 18 U.S.C. § 1962(c), commonly known as RICO. The indictment alleges that the PMC and its so-called support clubs constitute a criminal enterprise affecting interstate commerce. The PMC is a hierarchical motorcycle club organized into chapters operating in a number of states in the eastern United States. Support clubs are motorcycle clubs operating within the PMC's territory with the PMC's permission. Support club members wear a "16" patch on their club jackets to signify their association with the PMC. The support clubs allegedly are required to perform tasks for the PMC on demand, including engaging in illegal activity if necessary. The purpose of the PMC enterprise, according to the Government, is to enrich its members through unlawful means and to protect its territory and interests through intimidation and violence.

The PMC's national president, David Keith Barbeito, and national vice president, Floyd B. Moore, are named in Count One, along with PMC members Darrell K. Bumgarner, David A. Cremeans, Martin Craig Nuss, and Richard Timothy Weaver. They are each alleged to have participated in the affairs of the enterprise by engaging in a pattern of racketeering activity. The indictment lists nine separate racketeering acts, including kidnapping, robbery, conspiring to commit murder, obstruction of justice, and illegal gambling.

### A. RICO Elements

The subsection of the RICO statute charged in Count One provides, in pertinent part, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Five essential elements are readily derived from the statutory text: (1) an enterprise exists or existed; (2) the defendant was associated with the enterprise; (3) the defendant conducted or participated in the affairs of the enterprise; (4) such conduct or participation constituted a pattern of racketeering activity; and (5) the enterprise had an effect on interstate or foreign commerce. *See Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985); *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988). The parties are in agreement as to these basic elements of a substantive RICO offense.

The parties are not in accord, however, as to what the Government must prove to establish some of these elements. There is a dispute regarding whether the Government must prove the elements of state law offenses forming the basis for racketeering acts. There also is some confusion as to what the Government must prove to establish a pattern of racketeering activity. The

9

requirement that an enterprise must affect interstate or foreign commerce also has been raised. These issues warrant further discussion.

### B.  Proving Racketeering Acts Founded on State Law Offenses

To secure a conviction under RICO, the Government must prove, among other things, that a defendant has committed at least two racketeering acts.  18 U.S.C. § 1962(c), § 1961(5). Racketeering activity is defined as either "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical, . . . which is chargeable under State law and punishable by imprisonment for more than one year," or "any act which is indictable" under any of an extensive list of federal offenses.  18 U.S.C. § 1961(1).

Five of the nine racketeering acts listed in Count One are predicated on state law offenses. Racketeering Acts One and Two refer to separate alleged kidnapping incidents in violation of W. Va. Code § 61-2-14a and § 61-2-14e.  Racketeering Act Three charges robbery in violation of Ohio Rev. Code Ann. § 2911.02 and § 2923.03.  Racketeering Act Four alleges, among other things, that Defendants conspired to commit murder in violation of Ky. Rev. Stat. § 507.020 and § 506.040. Racketeering Act Seven concerns an alleged conspiracy to kidnap an individual in violation of W. Va. Code § 61-2-14a and § 61-10-31.[4]  The question here is whether the Government has the burden of proving that the Defendants named in these racketeering acts violated each element of the cited state statutes.

---

[4]  Racketeering Acts Five, Six, and Eight pertain to alleged violations of the Travel Act, 18 U.S.C. § 1952.  Like RICO, Travel Act violations can be predicated on violations of state law.  The Travel Act will be discussed further in Part VI, *infra*.

Defendants contend that the Government must prove the substantive elements of the state law offenses that form the basis for several of the racketeering acts charged in the indictment. The Government counters that although it is prepared to prove the elements of the underlying state-law offenses cited in the RICO count, it need only prove that the Defendants' actions fall within the "generic definition" of the offenses. Notwithstanding that the Government intends to prove the elements of the predicate state-law offenses at trial, the legal question must be clarified for the purposes of assessing proposed guilty pleas and properly instructing the jury at trial. Although the Government's position arguably enjoys some support among authorities that are not binding on this Court, *see United States v. Carrillo*, 229 F.3d 177, 184–84 (2d Cir. 2000) (discussing and questioning validity of precedents that support the Government's position here), it is not consistent with the statutory text.

The present dispute between the Government and Defendants evidences competing interpretations of § 1961(1)'s definition of racketeering activity. No binding authority directly resolves this dispute. Accordingly, the Court's analysis must begin with the text of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)). Furthermore, each word should be given effect so that no part of the text drafted by Congress is rendered "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

11

To secure a RICO conviction, the Government must prove that a defendant has committed at least two racketeering acts.  The language employed by Congress to define "racketeering activity" is plain in meaning and structure.  It should be read accordingly.  Where the racketeering acts are predicated on state law, a defendant's actions may qualify as racketeering activity if the actions are "chargeable" under state law and "punishable" by more than a year in prison.  18 U.S.C. § 1961(1).  Neither "chargeable" nor "punishable" are defined terms in RICO.  They should be given their ordinary meanings.   For an act to be chargeable under the law, generally there must be probable cause to believe that the act was in violation of the law.  For the act to be punishable, each element of the charged offense must be proven at trial or established in connection with a guilty plea.[5]  If a defendant's actions are not of a nature that they are both chargeable and punishable under state law, they cannot serve as a racketeering act as that term is defined in RICO.  *Cf. Carrillo*, 229 F.3d at 183–84 ("It is difficult to see . . . how the defendant could be properly convicted if the conduct found by the jury did not include all the elements of the state offense since RICO requires that the defendant have committed predicate acts 'chargeable under state law.'").  Thus, proving that a RICO defendant committed a racketeering act predicated on a violation of state law necessarily entails proving that the underlying act would satisfy each substantive element of the predicate state-law offense.[6]

_____

[5]  The phrase "punishable by imprisonment for more than one year" in the definition of racketeering activity also indicates that a proper state-law RICO predicate must be what traditionally is classified as felony.  *See United States v. Malizia*, 720 F.2d 744, 745 (2d Cir. 1983).  That is, it must carry a maximum statutory punishment of more than one year in prison.

[6]  This conclusion finds support, at least anecdotally, in Fourth Circuit precedents.  *See, e.g.*, *United States v. Celestine*, 43 F. App'x 586, 591–92 (4th Cir. 2002) (unpublished) (approving jury instructions for racketeering act predicated on murder where district court properly instructed jury
(continued...)

A contrary reading of the definition of racketeering activity—that is, as referring only to "generic definitions of the crimes charged," *United States v. Bagaric*, 706 F.2d 42, 63 (2d Cir. 1983)—would render the phrase, "chargeable under State law and punishable by imprisonment for more than one year," insignificant if not entirely superfluous.  Had Congress intended the result advocated by the Government, it could have accomplished this purpose in either of two ways.  First, Congress could have expressly defined "murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" for the purposes of RICO as referring to those crimes as they are generally defined or understood.   Second, Congress could have simply omitted the reference to state law from the definition of racketeering activity.  In that situation, courts would have little option but to look to common law and other sources to ascertain the generic definitions of the listed categories of offenses.  But Congress did neither.  Instead, its manifest intent was to rely on the state definitions of those offenses.

This Court will require the Government to prove no more or less than what is required by the text of RICO.  Where the Government charges a defendant with engaging in racketeering acts based on state-law violations, the Court thus will require the Government to prove that the act is both "chargeable" and "punishable" under the cited state law.  This means that the defendant's

---

[6](...continued)

as to the elements of the murder under North Carolina law); *ePlus Technology, Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002) (holding that plaintiff in civil RICO case must prove elements of federal mail and wire fraud statutes which serve as predicates for racketeering acts).  *Cf. Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2141 (2008) ("[W]e reject petitioners' contention that the 'common-law meaning' rule dictates that reliance by the plaintiff is an element of a civil RICO claim predicated on a violation of the mail fraud statute. Congress chose to make mail fraud, not common-law fraud, the predicate act for a RICO violation.").

actions must constitute a violation of the state-law offense charged as a racketeering act.  The defendant's actions must therefore satisfy the substantive elements of the predicate statute.[7]

Lest any confusion should arise, the Court highlights what this holding does not mean.  First, the elements of the state-law predicate are not elements of a RICO offense per se, so they need not be included in the indictment.  *See United States v. Orena*, 32 F.3d 704, 714 (2d Cir. 1994).  It also follows that the elements of the state-law predicates need not necessarily be included in the instructions to the jury.  If the facts elicited at trial establish that the defendant's actions violated the state statute charged as a predicate, then it is of little consequence  that the state-law elements were not put before the jury.  *See United States v. Tolliver*, 61 F.3d 1189, 1209 (5th Cir. 1995).  As a practical matter, however, the jury should be instructed on the state law elements, *see Stone*, 531 F. Supp. 2d at 490‒92, and this Court will rely on them when evaluating the factual basis for guilty pleas.  Second, the gravamen of a RICO offense is participating in the affairs of racketeering enterprise, not violating state law.  The elements of state-law predicates serve to define the type of conduct which constitutes racketeering activity, and no more.  State procedures and rules are not relevant to a RICO prosecution.  *See United States v. Licavoli*, 725 F.2d 1040, 1046‒47 (6th Cir. 1986); *United States v. Davis*, 576 F.2d 1065, 1067 (3d Cir. 1978); *United States v. Stone*, 531 F. Supp. 2d 486, 492‒93 (E.D.N.Y. 2008).

_____

[7] Practical considerations also favor this conclusion.  As the Second Circuit has noted, permitting the Government to prove racketeering acts based on generic descriptions of the predicate offenses, rather than the substantive elements of those offenses, leads to an increased risk of reversal on appeal because a reviewing court could not determine if the jury found the necessary facts constituting the predicate offense.  *Carrillo*, 229 F.3d at 184‒85 (outlining three hypothetical scenarios in which failure to instruct a jury on the elements of the predicate acts would lead to reversal on appeal).

14

*C.  Establishing a "Pattern of Racketeering Activity"*

RICO criminalizes an individual's participation in a criminal enterprise's "affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Pattern is defined only in part.  See *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) ("The text of RICO conspicuously fails anywhere to identify . . . forms of relationship or external principles to be used in determining whether racketeering activity falls into a pattern.").  The statute provides that a "'pattern of racketeering activity' requires *at least two* acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5) (emphasis added).  All that is clear from this definition is that two racketeering acts within a ten-year period are necessary, but that more than two may be required.  *Sedima,* 473 U.S. at 496 n. 14; *see also Anderson v. Found. for Advancement*, 155 F.3d 500, 506 (4th Cir. 1998); *Palmetto State Medical Ctr. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997).  RICO gives no further guidance as to what constitutes a pattern, and the task has fallen to the courts to flesh out this concept.

The Supreme Court's most recent detailed discussion of the meaning of a pattern of racketeering activity refined what is known as the "continuity plus relationship" test.  *ePlus Technology, Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002) (discussing *H. J. Inc.*, 492 U.S. at 239); *see also Sedima*, 473 U.S. at 496 n. 14 (originating the continuity plus relationship test based on RICO's legislative history).  Demonstrating a pattern requires proof "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc*., 492 U.S. at 239 (emphasis in original).  Notwithstanding that these concepts are derived from

15

the legislative history of RICO rather than the text of the statute, *H.J. Inc.*, 492 U.S. at 252 (Scalia, J., concurring), both relatedness and continuity must be present to establish a pattern under RICO, *United States v. Celestine*, 43 F. App'x 586, 591 (4th Cir. 2002) (unpublished) (holding that jury instructions must incorporate the concepts). In practice, however, proof of relatedness and continuity often will overlap. *United States v. Bennett*, 984 F.2d 597, 606 (4th Cir. 1993).

To prove the relatedness prong of the continuity plus relationship test, it must be shown that the racketeering acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. Acts are related because they share a connection to the affairs of the enterprise, and not necessarily because the acts themselves are inherently similar. *United States v. Abed*, No. 98-4637, 2000 WL 14190, 2000 U.S. App. LEXIS 261, at *27–28 (4th Cir. Jan. 10, 2000) (unpublished); *see also H.J. Inc.*, 492 U.S. at 238 ("It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged.'"). Thus, racketeering acts which can be characterized as being "in connection with the conduct of an enterprise" generally will satisfy the relatedness test. *Sedima*, 473 U.S. at 497.

The continuity prong of the continuity plus relationship test is intended to distinguish isolated garden-variety criminal acts from persistent and organized criminal activity deserving of RICO treatment. *See Al-Abood v. El-Shamari*, 217 F.3d 224, 238 (4th Cir. 2000); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989). Continuity refers to protracted criminal endeavors. *ePlus Technology, Inc.*, 313 F.3d at 182. It is a "closed- and open-ended concept," meaning that it covers racketeering acts that have occurred repeatedly over a substantial period of time or acts which

16

represent the threat of repetition in the future.  *H.J. Inc.*, 492 U.S. at 242.  More specifically, closed-ended continuity refers to situations in which the enterprise members' criminal activity occurred for months or years but has since ceased without the threat of future criminal acts.  *Id.*; *see also Eastern Pub. & Advertising, Inc. v. Chesapeake Pub. & Advertising, Inc.*, 895 F.2d 971, 973 (4th Cir. 1990) (finding no closed-ended continuity where single criminal scheme was completed within a span of three months).  There is no set period of time over which racketeering activity must have continued for it to satisfy the close-ended continuity test.

Open-ended continuity, which appears to be more germane to the case at hand, is present when there is an identifiable threat that the enterprise's members will continue to participate in the affairs of the enterprise through a pattern of racketeering activity in the future, or that the enterprise's members would have done so indefinitely but for the intervention of law enforcement. *H.J. Inc.*, 492 U.S. at 242.  The Supreme Court has given the following examples of open-ended continuity:

> Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage."  Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity.  In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.  Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.  Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime."  The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

17

*H.J. Inc.*, 492 U.S. at 242‒43; *see also GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549‒50 (4th Cir. 2001) (listing counterexamples of schemes that do not display open-ended continuity because they lack the threat of future criminal activity).

      The continuity plus relationship test provides guidance, but it does not supply concrete rules. This is a function of the statutory text of RICO's pattern requirement, which is no model of clarity. *See H.J. Inc.*, 492 U.S. at 249 ("RICO may be a poorly drafted statute . . . ."); *id*. at 256 (Scalia, J., concurring) ("That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill . . . ."); *see also Combs v. Bakker*, 886 F.2d 673, 677 (4th Cir. 1989) (calling RICO a "tormented statute").   For this reason, the Fourth Circuit has "deliberately declined to adopt any mechanical rules to determine the existence of a RICO pattern, holding instead that the issue is a 'matter of criminal dimension and degree' to be decided on a case-by-case basis." *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1998) (quoting *International Data Bank v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)); *see also Walk v. Baltimore & Ohio R.R.*, 890 F.2d 688, 690 (4th Cir. 1989) ("The [Supreme] Court's guidance on the pattern requirement, as the Court has twice now recognized and lamented, cannot be in bright-line terms, given the statutory text.").   With the general principles outlined above for guidance, the finding of a pattern of racketeering activity as to Count One Defendants will be committed to the discretion of the finder of fact, be it this Court or a jury.

### D.  Requisite Effect on Interstate Commerce

      RICO applies only to enterprises that are "engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1962(c).  This is a jurisdictional element.  *United States v. Fernandez,* 388 F.3d 1199, 1220 (9th Cir. 2004); *United States v. Malatesta*, 583 F.2d 748,

754 (5th Cir. 1978). As the "'jurisdictional peg' on which to hang the federal prosecution," there need not be proof that the defendant was aware of the interstate commerce nexus. *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (quoting *United States v. LeFaivre*, 507 F.2d 1288, 1299 (4th Cir. 1974)). The relevant inquiry is whether the enterprise affects or is engaged in interstate commerce, not whether specific racketeering acts affect commerce. *United States v. Altomare*, 625 F.2d 5, 8 n.8 (4th Cir. 1980); *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979). This element can be proved in either of two general ways. The "'affecting commerce' test" applies if the enterprise's activities are purely intrastate but have an incidental effect on interstate commerce. *United States v. Robertson*, 514 U.S. 669, 671 (1995). This test is of little use here because the PMC operates across multiple states. The second test, "engaged in commerce," applies if the enterprise "directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." *Id.* at 672. The enterprise's engagement in interstate commerce need only be minimal to establish the jurisdictional element. *United States v. Nascimento*, 491 F.3d 25, 37 (1st Cir. 2007); *United States v. Frega*, 179 F.3d 793, 800 (9th Cir. 1999); *United States v. Farmer*, 924 F.2d 647, 651 (7th Cir. 1991); *see also Altomare*, 625 F.2d at 8 (finding commerce nexus where enterprise purchased supplies from out of state, placed interstate phone calls, and employed people in multiple states); *United States v. Allen*, 656 F.2d 964 (4th Cir. 1981) (finding commerce nexus where enterprise used supplies that had traveled in interstate commerce).

## *IV. RICO CONSPIRACY*

Count Two of the indictment charges certain Defendants with conspiring to commit the substantive offenses charged in Count One in violation of 18 U.S.C. § 1962(d). Defendants Barbeito, Cremeans, Weaver, Nuss, Bumgarner, and Floyd Moore are alleged to have agreed to

19

conduct or participate in the affairs of the PMC through a pattern of racketeering activity.  The racketeering acts set forth in Count One are incorporated by reference into Count Two.

RICO contains its own conspiracy subsection.  18 U.S.C. § 1962(d) provides, "It shall be unlawful for any person to conspire to violate any of the provisions of [the substantive sections of RICO]."  Both the Government and Defendants contend that three elements are necessary to establish a RICO conspiracy, but the contents of the elements advanced by the parties differ.

The leading authority on criminal RICO conspiracies is *United States v. Salinas*, 522 U.S. 52 (1997).[8]  In *Salinas*, the Supreme Court concluded that RICO conspiracies are governed by "certain well-established principles" applicable to criminal conspiracies generally.  *Id*. at 63.  The essence of a RICO conspiracy, like any other conspiracy, is the agreement to accomplish some criminal purpose.  *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990).  To be guilty of the offense, a RICO conspiracy defendant "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense."  *Salinas*, 522 U.S. at 65.  The defendant must agree to further or facilitate this goal in some manner but he need not agree to complete all elements of the substantive offense to be guilty of a conspiracy.  *Id*.  Thus, the defendant need not agree to personally commit two racketeering acts.[9]  *Id*.; *Pryba*, 900 F.2d at 760. As with all conspiracies, a RICO conspirator is liable for the acts of co-conspirators in furtherance of the conspiracy.  *Salinas*, 522 U.S. at 63−64 (citing *Pinkerton v. United States*, 328 U.S. 640, 646

---

[8]  Civil RICO conspiracies involve standing issues regarding injuries to the aggrieved party which complicate the analysis.  *Cf. Sadighi v. Daghighfekr*, 36 F. Supp. 2d 267, 271−72 (D.S.C. 1999). These issues are not relevant in a criminal RICO conspiracy context.

[9]  Of course, a defendant who agreed with another to personally commit a pattern of racketeering acts would satisfy the agreement element of a RICO conspiracy.  *See United States v. Ashman*, 979 F.2d 469, 491−92 (7th Cir. 1992).

(1946)).  Unlike conspiracies under 18 U.S.C. § 371, however, the Government need not prove that the accused or any co-conspirator committed an overt act in furtherance of the RICO conspiracy. *Salinas*, 522 U.S. at 63.

Based on these general conspiracy principles, the Fourth Circuit, albeit in an unpublished decision, has distilled two essential elements of a criminal RICO conspiracy: "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense."  *United States v. Abed*, No. 98-4637, 2000 WL 14190, 2000 U.S. App. LEXIS 261, at *31–32 (4th Cir. Jan. 10, 2000) (unpublished) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)); *see also United States v. Gardner*, 417 F. Supp. 2d 703, 711 (D. Md. 2006).  With respect to the first element, the agreement must be "(a) to personally commit a violation of sections 1962(a)–(c); (b) to aid or abet a violation; or (c) that another co-conspirator commit a violation."  *In re American Honda Motor Co., Dealerships Realtors Litig.*, 941 F. Supp. 528, 560 (D. Md. 1996) (citing *Pryba*, 900 F.2d at 760).  The existence and nature of the agreement may be inferred from the circumstances.  *See Posada-Rios*, 158 F.3d at 857; *Ashman*, 979 F.2d at 491–92; *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).  Regarding the second element, each RICO conspiracy defendant need not know all the details of the conspiracy.  It is sufficient that he entered the agreement knowing the "essential nature" or object of the conspiracy.  *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985); *see also United States v. Starrett*, 55 F.3d 1525, 1544 (11th Cir. 1995); *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989).

*V.  VICAR*

Several Counts in the indictment charge Defendants with committing or conspiring to commit violent crimes in aid of racketeering in violation of various subsections of 18 U.S.C. § 1959, which is also known as VICAR.

Count Three charges Defendants Cremeans, Weaver, Bumgarner, Floyd Moore, Shawn Bloss, Ronald Rowsey, Dale Wright, and Steve Stover with conspiring to commit assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(6).  Defendant Stover pled guilty to this count.  The factual basis is discussed in the stipulation of facts attached to his plea agreement.  It also is discussed in the stipulation of facts of Defendant Bumgarner, who pled to a related count, and in a joint memorandum filed by Defendant Stover and the Government.  What is evident from the record is that one of the PMC's support clubs, the Road Disciples Motorcycle Club (RDMC), was not satisfactorily fulfilling its obligations as a support club for the PMC.  Members of the PMC and another support club, the Last Rebels Motorcycle Club (LRMC), traveled from various locations in West Virginia to the RDMC's clubhouse in Portsmouth, Ohio.  The Government alleges that the members who participated in the trip did so with a conspiratorial agreement to commit an assault against the RDMC members.  Some of the PMC and LRMC members were armed with ax handles and at least one possessed a handgun.  Upon arriving at the clubhouse, the group confronted the RDMC's president and presented him with an ultimatum: the RDMC would either have to agree to fulfill its support club obligations or turn over its members' "16" patches—the indicia of its PMC support-club status.  The RDMC president feared that he would be harmed if he did not comply, so he surrendered his club's "16" patches.  The predicate offenses cited for this count are violations of W. Va. Code § 61-2-9, § 61-10-31, and Ohio Rev. Code Ann. § 2903.11(A).

22

Count Five charges Defendants Cremeans, Bumgarner, Thomas Geer, Michael Lloyd Stevens, and Richard Lee Stevens with conspiring to commit murder in aid of racketeering in violation of 18 U.S.C. 1959(a)(5). The factual basis for this offense has been addressed on the record. According to the alleged facts in the record, members of the PMC and LRMC formed a plot to murder an inmate at the Federal Correctional Institution in Ashland, Kentucky (FCI Ashland). The intended victim was a PMC member suspected of being a "snitch" for cooperating with federal law enforcement officers. The attack was to be carried out by an inmate who is not named in the indictment and was allegedly facilitated by Defendant Michael Stevens, who was then a corrections officer at FCI Ashland. The plot was disrupted by law enforcement before its objective was completed. The predicate offenses cited for this count are violations of W. Va. Code § 61-2-1, § 61-10-31, and Ky. Rev. Stat. § 506.040, § 507.020.

Count Six charges Defendants Cremeans, Weaver, Nuss, Richard Stevens, Corey Hinkle, Eric Wolfe, James Claypool, and James Hoback with conspiring to commit an assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(6). The alleged conspiracy took place in March 2006 in St. Albans, West Virginia, and Richmond, Virginia. No additional factual information about this count is currently in the record. The predicate offenses cited for this count are violations of W. Va. Code § 61-2-9, § 61-10-31, and Va. Code Ann. § 18.2-57.

Count Nine charges Defendant Weaver with conspiring to kidnap an individual in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5). The alleged kidnapping conspiracy occurred during June 2007 in St. Albans, West Virginia. No additional factual information about this count is currently in the record. The predicate offenses cited for this count are violations of W. Va. Code § 61-2-14a and § 61-10-31.

23

Count Ten charges Defendants Jeffrey Wayne Jett, Anthony Wayne Peters, Donald L. Massey Jr., Eric Wayne Lyttle, and James Edward Lyttle with threatening to commit a crime of violence in aid of racketeering activity, or aiding and abetting such threats, in violation of 18 U.S.C. § 1959(a)(4) and § 2. Defendants Massey and Eric Lyttle pled guilty to the corresponding count in the original indictment and the factual basis is discussed in the stipulations of facts attached to their plea agreements. The offense conduct also is discussed in the plea agreement of James Lyttle, who pled guilty to a different offense. According to those stipulations, Defendant Floyd Moore ordered the Count Ten Defendants, who are all members of the LRMC support club, to shut down a small motorcycle club called Next to Kin. The Next to Kin's offense was not obtaining permission from the PMC to operate a motorcycle club in PMC territory. The LRMC members confronted members of the Next to Kin, two men and two women, who had pulled over on the side of a road in Boone County, West Virginia. The LRMC allegedly used threats of violence to persuade the Next to Kin members to part with their jackets and patches. Defendant James Lyttle admitted carrying a handgun during the incident.[10] The predicate offense cited for this count is a violation of W. Va. Code § 61-2-9.

Count Twelve charges Defendant Dean with threatening to commit a crime of violence in aid of racketeering in violation of 18 U.S.C. § 1959(a)(4). The alleged threat occurred on June 22, 2008, in Charleston, West Virginia. No additional factual information about this count is currently in the record. The predicate offense cited for this count is a violation of W. Va. Code § 61-2-9.

---

[10] This admission formed the factual basis for Defendant James Lyttle's guilty plea to Count Eleven of the original indictment which charged him with carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c).

24

Count Fourteen charges Defendants Wolfe, Claypool, Rocco Boyd, Joseph Frank Cotton, Elmer Luke Moore, and Dante Demarco with committing an assault with a dangerous weapon in aid of racketeering, or aiding and abetting the same, in violation of 18 U.S.C. § 1959(a)(3) and § 2.[11] The factual background for this offense is discussed in a stipulation of facts signed by Defendant Claypool in connection with his guilty plea to a different offense.  According to that stipulation, the PMC held a mandatory gathering in Hammonton, New Jersey, on January 10, 2009.  Upon arriving at their hotel in Hammonton, Defendants named in this count allegedly cornered another PMC member in a hotel room.  The alleged victim was accused of being an informant for law enforcement and searched for recording devices.  He was then allegedly beaten by the assembled PMC members at the direction of Defendant Elmer Moore.  The predicate offenses cited for this count are violations of W. Va. Code § 61-2-9 and N.J. Stat. Ann. § 2C:12-1(b).

Defendant Morris pled guilty to an information charging him with conspiring to commit kidnapping in aid of racketeering in violation of 18 U.S.C. § 1959(5).  According to a stipulation of facts attached to Morris's plea agreement, a man broke into Defendant Floyd Moore's home in June 2007 and violently assaulted Moore and his girlfriend.  Moore put out the word to members of the PMC and its support clubs that they were to locate and kidnap the man so Moore could exact revenge.  Defendant Morris, in his role as chapter president of a PMC support club aptly called the Avengers, instructed the club's members to find and restrain the man for Moore.  There is no evidence that a kidnapping ever occurred.  The predicate offenses cited for this count are violations of W. Va. Code § 61-2-14a and § 61-10-31.

---

[11]  Defendants Boyd and Cotton have since been dismissed from this case.

### A.  VICAR Elements

VICAR states, in pertinent part:

> Whoever . . ., for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .

18 U.S.C. § 1959(a).  The elements of a substantive VICAR offense are not subject to significant dispute.  The Government is required to prove the following five elements:

> (1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.

*United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (quoting *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir. 1992)).  There are disputes between the parties as to what the Government must prove to establish several of these elements, however.  These disputes will be explored below.

### B.  Establishing an Enterprise "Engaged In Racketeering Activity"

It is necessary at the outset to distinguish VICAR from similar elements of RICO.  VICAR was "enacted to complement RICO," *United States v. Rogers,* 89 F.3d 1326, 1335 (7th Cir. 1996), and its text and structure bears a resemblance to RICO.  Care must be taken, however, to take account of the differences in the statutes so as to avoid confusing their elements.  VICAR's requirement of proof of an enterprise engaged in racketeering activity is one such element that must be distinguished from RICO's pattern of racketeering element because the parties have at times confused these elements throughout the course of this case.

26

VICAR contains a definition for the term "enterprise" and shares its definition of "racketeering activity" with RICO.  It defines an "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).  This is identical to RICO's definition of "enterprise" with one minor exception: the RICO enterprise definition does not include the interstate commerce nexus language.[12]

"Racketeering activity" in VICAR is given the same meaning as the definition of the term for  RICO. § 1959(b)(1).  "Racketeering activity" is defined as, "(A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of [the United States Code]."  18 U.S.C. 1961(1).

Unlike RICO, the word "pattern" does not appear in VICAR.  Whereas RICO requires proof that the accused engaged in a "pattern of racketeering activity," VICAR requires proof of an "enterprise engaged in racketeering activity"—without reference to a pattern.  There is no statutory definition for the phrase "engaged in racketeering activity," nor is there clear guidance from the

---

[12]  As discussed above in Section III.D, RICO includes an interstate commerce nexus requirement in the body of the statute.  18 U.S.C. § 1962.

Fourth Circuit on this point.[13]  The most in-depth treatment of this phrase comes from the Second Circuit which has discussed this issue in several cases.  The standard is not clearly defined, however.

In a series of cases, the Second Circuit has developed useful guidance on how to identify the acts of an enterprise.  Those cases recognize that an association-in-fact enterprise can act only through its members.  *See United States v. Pimentel*, 346 F.3d 285, 297–98 (2d Cir. 2003); *United States v. Cutolo*, 861 F. Supp. 1142, 1146 (E.D.N.Y. 1994).  Thus, for an enterprise to engage in racketeering activities, its members would have to engage in the activities "on behalf of the enterprise."  *Id*.  Determining whether an enterprise's members have engaged in racketeering activities on its behalf involves "fact-based attention to the ways in which . . . the individuals acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group."  *United States v. Feliciano*, 223 F.3d 102, 116–17 (2d Cir. 2000); *see also Pimentel*, 346 F.3d at 296–97.  In practice, proof of an enterprise acting through its members often will overlap with proof that illegal conduct was undertaken to gain entry to or to maintain a position in the enterprise.  If a member's position in the enterprise is tied to performing an illegal act, then it should follow that the act would be the act of the enterprise.  This is not the only way to prove enterprise action, of course.

---

[13]  The Fourth Circuit's most detailed discussion of proof for this element is largely anecdotal:

> [T]o satisfy its requirement of proving that the enterprise engaged in racketeering activity, the government could rely on the same evidence that it used to prove the existence of an enterprise because racketeering activity includes "any act or threat involving . . . dealing in a controlled substance." Thus, the evidence that the enterprise dealt in drugs would likewise be sufficient to support a jury finding that the enterprise engaged in racketeering.

*United States v. Gray*, 137 F.3d 765, 773 (4th Cir. 1998); *see also Fiel*, 35 F.3d at 1004.

28

Whereas RICO's pattern requirement requires at least two related racketeering acts within a ten-year span, VICAR requires no set number of racketeering acts, nor does it expressly require a particular relationship among the acts. Authority is sparse as to how extensive or connected an enterprise's racketeering activities must be for it to be deemed "an enterprise engaged in racketeering activity." There is authority for the proposition that only one racketeering act need by proven. *See, e.g., United States v. Garfinkle*, 842 F. Supp. 1284, 1292 (D. Nev. 1993) ("[I]t would be possible for an otherwise legitimate enterprise which engages in a single act of racketeering activity to be deemed 'engaged in racketeering activity' for a short period of time on either side of the actual commission of the racketeering activity."). There also is authority to the contrary. *See, e.g., Cutolo*, 861 F. Supp. at 1146 ("Presumably § 1959 does not apply where [the enterprise's members] committed only a single crime. The word 'engaged' implies more than that."). Another question raised but left unresolved in the relevant case law is what temporal connection, if any, is required between the predicate crime of violence and the enterprise's racketeering activity. *See, e.g., Bracy*, 67 F.3d at 1429 (noting that evidence was sufficient where enterprise engaged in racketeering acts before and after the predicate crime of violence); *Garfinkle*, 842 F. Supp. at 1292 (requiring that predicate crime of violence occur within some short but indefinite period of time before or after the commission of a racketeering act by the enterprise). The case law on point is instructive but provides few definitive answers. Accordingly, the Court's analysis of VICAR's "enterprise engaged in racketeering activity" element turns to the statutory text. *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996).

The Court must give statutory "terms their 'ordinary, contemporary, common meaning, absent an indication Congress intended [them] to bear some different import.'" *Stephens v. Astrue*,

29

565 F.3d 131, 137 (4th Cir. 2009) (quoting *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 351 (4th Cir. 2008)).  The term, "engaged in," is not defined, nor is there a clear indication that Congress intended it to have a unique meaning.  Something may be gleaned, however, from the fact that the term appears twice in VICAR and three times in RICO.  The other uses of the term are in the context of an enterprise "engaged in . . . interstate or foreign commerce."  18 U.S.C. § 1959(b)(2); § 1962(a), (b), (c).  Courts have given this term an expansive interpretation in that context, holding that a minimal connection to interstate commerce suffices to demonstrate that an entity is engaged in commerce.  *See, e.g., Gray*, 137 F.3d at 772‑73.  These decisions counsel against an interpretation of "engaged in racketeering activity" that would require extensive or protracted engagement.

VICAR and RICO are *in pari materia* and should be construed together.  The statutes are similar in structure and share definitions for several of their terms.  Congress drafted a single definition of "racketeering activity" for VICAR and RICO in 18 U.S.C. § 1961, but chose not to apply the definition of "pattern of racketeering activity" found in the same section to VICAR.  The obvious conclusion to draw is that required elements of a pattern—namely, two related racketeering acts within a ten-year span—should not be applied to VICAR.

With these observations, the Court turns to the common usage of the term "engaged in."  When used in an adjectival phrase, this term denotes that the subject is involved in an activity.  *Cf.* Black's Law Dictionary 570 (8th ed. 2004) (defining verb form of "engage" as, "To employ or involve oneself; to take part in; to embark on"); Merriam-Webster's Collegiate Dictionary 383 (10th ed. 1998) (defining adjective "engaged" as, "involved in activity").  In common parlance, when a sentence is in the present tense, the term "engaged in" connotes that the thing is "presently engaged"

30

in the activity.  For example, to say that, "She is a member of an organization engaged in philanthropy," suggests that the group is actively and presently involved in philanthropic pursuits. There being no evidence to the contrary, it can be presumed that Congress employed the term in this common and generally understood manner.

Applying these principles to VICAR's "enterprise engaged in racketeering activity" language leads to the following conclusions about what the Government must prove to establish this element of the offense.  It appears that the intent of the statutory language is to create a federal offense for violent crimes committed to gain entry to or maintain a position in an enterprise engaged in racketeering activity at the time the predicate violent crime was committed.  Thus, the Government must prove, in this case, that Defendants charged with VICAR offenses committed the predicate crimes during a period in which the PMC enterprise was actively involved in racketeering activity. Additionally, the use of "engaged in" in the interstate commerce nexus element of VICAR and RICO, coupled with the absence of a pattern requirement in VICAR, suggests that the involvement in racketeering need not be extensive; that is, proof of a single racketeering act committed by the enterprise may suffice.

These seemingly contradictory conclusions—that the enterprise must be actively and presently engaged in racketeering activity at the time the VICAR predicate was committed and that proof of only one racketeering act is necessary—can be reconciled by borrowing the concept of open-ended continuity from the RICO pattern analysis.  Open-ended continuity is based in part on the idea that racketeering activity may be characterized as "continuing" if there is an ongoing *threat*

31

of racketeering activity.[14]  This threat may arise from the nature of the racketeering activity or from the enterprise's practices and methods of operation if they typically involve racketeering activity. Under that analysis, adapted to a VICAR context, a single racketeering act may give rise to the threat of ongoing racketeering activity.  For example, a first-time racketeer may send a letter to a business-owner with a message that the owner must mail payments to the racketeer every month or his business would be firebombed.  This threat of future racketeering activity, namely arson, could continue well into the future.  During the time period that this extortionate scheme and its attendant threat of arson continued, it would be fair to state that the racketeer would be engaged in racketeering activity.  A word of caution is in order: While proof of one act could, as discussed herein, suffice to prove that an enterprise is engaged in racketeering activity, it will not always suffice and should not be viewed as a standard minimum.

A pattern need not be shown under VICAR, so the temporal frame of reference is much shorter than it is for RICO.  For VICAR, the important time frame is the moment the VICAR predicate offense was committed.  It is at that moment that the statute requires that the enterprise be "engaged in" racketeering activity.  Whether the enterprise's engagement in racketeering activity lasted for a long period of time before or after a defendant's predicate crime of violence is immaterial in the VICAR context.

In sum, the Government must prove the following to establish VICAR's "enterprise engaged in racketeering activity" element: (1) that there was a present and ongoing threat that the enterprise would commit racketeering acts through its members; (2) that the threat arose from one or more

---

[14]  Open-ended continuity is discussed in greater detail in Section III.C, *supra*.

racketeering acts committed by a member of the enterprise on behalf of the enterprise; and (3) that the threat was existent at the time the predicate crime of violence was committed.[15]

### C.  Purpose of Maintaining or Increasing a Position in the Enterprise

The mens rea element of VICAR has been responsible for one rejected plea thus far.  Its meaning should be clarified.  A VICAR conviction requires proof that a defendant act "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise."  18 U.S.C. § 1959(a).  This purpose need not be the only purpose for committing the act of violence.  *United States v. Banks*, 514 F.3d 959, 966–68 (9th Cir. 2008); *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994); *Concepcion*, 983 F.2d at 381.  It must be more than an incidental purpose or an afterthought, however.  Furthermore, there is no presumption that a violent crime committed by a member of a RICO enterprise was for the purpose of maintaining or increasing the member's position in the enterprise.  A defendant does not necessarily

> fall within the scope of VICAR if his desire to enhance or maintain his status in the organization had any role, no matter how incidental, in his decision to commit a violent act.  To adopt such a broad interpretation would risk extending VICAR to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang; if the reach of this element were not cabined in some way, prosecutors might attempt to turn every spontaneous act or threat of violence by a gang member into a VICAR offense.  The VICAR statute itself contains no indication that Congress intended it to make gang membership a status offense such that mere

---

[15]  The simplest way to demonstrate that the enterprise was engaged in racketeering activity would be to prove that its members committed racketeering acts on its behalf both before and after the VICAR predicate.  *See, e.g.*, *Bracy*, 67 F.3d at 1429.  In most instances, such proof would give rise to the inference that the threat of racketeering activity was present at the time the VICAR predicate offense was committed.  However, this inference may not be true if, for example, the enterprise's racketeering activity prior to the commission of the alleged VICAR predicate had ceased such that the threat of future racketeering activity was no longer present, and the subsequent racketeering activity commencing after the VICAR predicate act signaled an unexpected return to criminal endeavors.

membership plus proof of a criminal act would be sufficient to prove a VICAR violation.

*Banks*, 514 F.3d at 968.

The phrase "maintaining or increasing position in an enterprise" is not defined in the statute, so its words are to be given their ordinary meanings. *Fiel*, 35 F.3d at 1004. Its meaning has been clarified by a number of cases that define what it means to "maintain" or "increase" one's position in an enterprise. A 's conduct satisfies the motive element of VICAR if committing the violent crime was an "integral aspect of membership" or if the conduct was expected by virtue of the defendant's membership in the enterprise. *Id.* (citing *Concepcion*, 983 F.2d at 381); *see also United States v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006); *United States v. Phillips*, 239 F.3d 829, 845 (7th Cir. 2001); *United States v. Rahman*, 189 F.3d 88, 127 (2d Cir. 1999). For example, a member of an enterprise whose role is that of an "enforcer" satisfies the motive element if he murders a person who has attacked a leader of the enterprise, if failing to retaliate would undermine his role as an enforcer. *United States v. Gross*, 199 F. App'x 219, 236‑37 (4th Cir. 2006); *see also United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997). Similarly, the element is satisfied if there is a perceived threat to the enterprise and failure to respond to the threat with violence would undermine the defendant's position in the organization. *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001); *Diaz*, 176 F.3d at 95‑96. Violent crimes committed to protect the enterprise's racketeering activities also generally satisfy the motive element. *Diaz*, 176 F.3d at 95‑96.

An enterprise's expectations of its members may be relevant, at least as circumstantial evidence that a defendant acted with the purpose of maintaining or increasing his position in the enterprise. It therefore may be relevant that an enterprise has policies or rules that require its members to respond with violence to affronts or challenges to its members. *See United States v.*

34

*Rubi-Gonzalez*, 311 F. App'x 483, 486 (2d Cir. 2009); *United States v. Olson*, 450 F.3d 655, 673 (7th Cir. 2006); *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996). Thus, the motive element of VICAR may be satisfied if it is demonstrated that committing an act of violence in response to a particular action by a third-party is expected or demanded of members and failure to commit the act would diminish a member's standing in the enterprise. Such evidence may be buttressed by evidence that the violent acts were reported to a defendant's superiors in the enterprise. *United States v. Crenshaw*, 359 F.3d 977, 996 (8th Cir. 2004); *United States v. Boyd*, 792 F. Supp. 1083, 1102 (N.D. Ill. 1992).

Violent acts committed to aid the enterprise by cultivating its reputation for violence can satisfy the motive element if the defendant's actions in support of this end maintained his position in the enterprise. *See United States v. Hoyte*, 51 F.3d 1239, 1244–45 (4th Cir. 1995). However, it does not follow that any and all acts of violence by members of enterprises that operate in this manner satisfy the motive element. The operative question is whether the defendant had the purpose of cultivating the enterprise's reputation for violence in mind, as opposed to a personal motivation, when committing the act of violence. *See United States v. Jones*, 291 F. Supp. 2d 78, 89 (D. Conn 2003). Furthermore, courts have rejected unsupported inferences, proffered by the Government, that acts of violence by a member of a racketeering enterprise committed for ostensibly personal reasons were motivated by a desire to increase the member's position. *Id*. at 90.

Similarly, violent crimes committed by members of an enterprise which further the purpose of the enterprise do not automatically satisfy the motive element of VICAR. Acts in furtherance of enterprise's activities can be motivated by reasons other than self-promotion within the enterprise. For example, in *United States v. Thai*, 29 F.3d 785 (2d Cir. 1994), the defendant was the leader of

35

a gang which derived income from extorting money from certain businesses. The defendant ordered gang members to bomb a restaurant because a third-party had paid him $10,000 to carry out the bombing. *Id*. at 818. Although related tangentially to the enterprise's activities, the bombing was construed as a side agreement between the gang leader and the third-party. The Second Circuit observed that the evidence suggested that his motivation was his own pecuniary gain. *Id*. There was no evidence that he was expected by the gang to carry out the bombing, or that his leadership was in question such that ordering the bombing would enhance his position. *Id*. Accordingly, the motive element of the VICAR charge was not satisfied. *Id*. at 819.

The above-cited cases demonstrate that VICAR's mens rea element can be demonstrated in a variety of ways, often by inference from the facts. Nevertheless, the words, "for the purpose of," cannot be read out of VICAR, and the fact that this element pertains solely to a defendant's mental state is disregarded at counsels' peril. Whether the predicate act of violence in fact had the effect of enhancing the member's position is irrelevant if that result was not a motivating purpose for the defendant's violent actions.

### D.  Proving Substantive VICAR Predicates Founded on State Law Offenses

At issue in this section is what evidence the Government must put forth to prove "that the defendant committed the alleged crime of violence," which is an essential element of a VICAR offense. *Fiel*, 35 F.3d at 1003. The Government and certain Defendants vigorously dispute whether the Government must prove the substantive state-law elements of VICAR predicates charged as violations of state law. The Government contends that VICAR's reference to offenses "in violation of the laws of any State" means that the state-law offenses are intended to serve a "definitional purpose." That is, the Government must prove the generic or common law elements of the predicate

36

crimes of violence, rather than the substantive elements that would be required to secure a conviction on those state-law offenses in a state court.[16]  If the state law contains an unusual element that is not included in the generic definition of the crime of violence identified in VICAR, the Government maintains that it need not provide proof of that element.  Similarly, the Government stated at the hearing that if, for example, it were lawful to commit an assault with a dangerous weapon in West Virginia, a VICAR conviction could still be obtained for assaults with a dangerous weapon committed in the state based on the generic elements of that offense.  Defendants respond that the Government's position leaves them without proper guidance.  Without knowing, with specificity, what elements the Government will have to prove to establish the VICAR predicates, Defendants cannot make informed decisions about potentially entering guilty pleas or prepare for trial on the VICAR counts.[17]

Before delving into the statutory test, the Court must first winnow the chaff from the grain. Extraneous concepts and misapplied precedents have contributed to unnecessary complication and confusion.  There is a benefit to be gained in disposing of the terms "generic sense" and "definitional purpose" which have insinuated themselves into the Government's argument that it need not prove

---

[16]  The Government's position on this issue has not been consistent.  In a memorandum filed in support of the factual basis for Defendant Stover's plea to the VICAR charge in Count Three, the Government said, "For this Defendant to be guilty under 18 U.S.C. § 1959(a)(6), he must also have met the elements of one of the state crimes alleged."  (Docket 1449, at 7.)  Contrast this to the following exchange, which is quoted from a rough draft of the transcript of the hearing held May 4, 2010.  The Court asked: "[Y]our position is you don't have to prove the elements of the state law crime—that you might happen to prove them if in the course of proving the generic definition you also happen to prove the elements of the state law crime, but you don't have to?"  Counsel for the Government replied, "Yes."

[17]  This issue is complicated considerably by the Government's decision to charge some of the VICAR predicates under state conspiracy statutes.  This section will address the substantive state-law predicates.  VICAR conspiracies will be addressed more fully in a later section.

37

that the VICAR Defendants' actions violated state law.  The argument goes: VICAR refers to state laws in a "generic sense" and those laws serve merely a "definitional purpose," and therefore the Government need not worry with the substantive elements of those offenses.  Yet these terms, if correctly defined, have little bearing on the question at hand.

The term "generic sense" comes from the legislative history of VICAR.  The Government cites a committee report wherein it is stated, "While Section [1959] proscribes murder, kidnaping, maiming, assault with a dangerous weapon, and assault resulting in serious bodily injury in violation of federal or State law, it is intended to apply to these crimes in a generic sense, whether or not a particular State has chosen those precise terms for such crimes."   129 Cong. Rec. 22, 906 (98th Cong. 1st Sess. Aug. 4, 1983).  The only useful inference that can be drawn from the use of the term "generic sense" in this report is that Congress intended that state offenses falling within the general categories of criminal conduct listed in VICAR (murder, kidnapping, etc.) can serve as predicates regardless of the title or name that various states might give their statutes.  It would not matter, for instance, if a state statute criminalizing conduct that generally could be called "assault with a dangerous weapon" is labeled "brandishing," "wounding," or "menacing."

It is evident from this quoted report that Congress intended VICAR's reference to state law offenses to be interpreted much like similar language in its companion statute, the Travel Act.[18]  In *United States v. Nardello*, 393 U.S. 286 (1969), which predates VICAR by fifteen years, the Supreme Court construed the phrase "extortion . . . in violation of the laws of the State in which they

---

[18]  VICAR initially was codified in 1984 at 18 U.S.C. § 1952B, joining the Travel Act which was changed from § 1952 to § 1952A at that time.  Comprehensive Crime Control Act of 1984, Pub L. No. 98-473, § 1002, 98 Stat. 1837, 2136‒37; *see also* H.R. Rep. No. 98-1030, at 304‒07, *reprinted in* 1984 U.S.S.C.A.N. 3182, 3483‒87 (discussing related purposes of VICAR and Travel Act).  The Travel Act is now again codified at § 1952.

are committed" in the Travel Act.  It held that a Pennsylvania statute labeled "blackmail" applied to extortionate activity generally and therefore was a proper predicate offense falling within the Travel Act's category of extortion in violation of state law.  *Id*. at 295 ("We therefore conclude that the inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged.").  Accordingly, the assertion that VICAR refers to state law offenses in a "generic sense" means that state offenses not sharing VICAR's labels but applying to the same general types of conduct may serve as proper VICAR predicates.  This term and the concept it signifies therefore is inapplicable to the question of whether the Government must prove the substantive elements of the state-law predicate offenses.[19]

The term "definitional purpose" is similarly inapposite.  The Government cites *United States v. Diaz*, wherein the court stated that "references to state law in these statutes merely serve a definitional purpose, that is, to identify generally the kind of conduct made illegal by the federal statute."  176 F.3d 52, 100 (2d Cir. 1999).  Taken out of context, this statement arguably supports the Government's position.  But that statement was made in the course of the court's holding that state evidentiary and procedural laws are not incorporated into VICAR along with the state-law predicate offenses.  More specifically, the court concluded that the district court did not need to instruct the jury on Connecticut's unusual co-conspirator liability doctrine when the predicate offense was based on Connecticut's murder statute.  *Id*. at 87, 99–100.  *Diaz* does not foreclose the possibility that  VICAR may utilize a state's law to define the predicate offense (i.e., to provide

---

[19]  The concept of VICAR referring to state crimes in a generic sense is pertinent, however, to determining whether a particular state statute can serve as a VICAR predicate offense.  The lesson from *Nardello* is that the content of the statute is relevant to this analysis, not the name or title the state gives to that offense.

statutory language from which essential elements can be derived) without also adopting the state's rules of evidence and procedure. *Cf. Carrillo*, 229 F.3d at 183 (construing similar RICO predicate act provision) ("Refusal to incorporate state procedural and evidentiary requirements has no logical bearing on the issue whether in a federal RICO prosecution the government must prove the elements of the state law offense that serves as a predicate racketeering act."). Whether VICAR operates in this manner must be decided on the basis of the statutory text.

As stated more fully above, the Court's interpretation of the statute must give effect to the meaning of the statutory text if it is plain and the result is not absurd. *Lamie*, 540 U.S. at 534. At the same time, the Court must avoid any construction of the statute which renders any of its words "superfluous, void, or insignificant." *TRW Inc.*, 534 U.S. 19 at 31. The part of VICAR at issue here provides, "Whoever . . . murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual *in violation of the laws of any State* or the United States . . . shall be punished . . . ." 18 U.S.C. § 1959(a) (emphasis added).

Courts have uniformly understood the phrase "in violation of the laws of any State" in VICAR as applying to each listed category of predicate crimes of violence. *See United States v. Le*, 316 F. Supp. 2d 355, 360 (E.D. Va. 2004) (citing cases); *see also Nardello*, 393 U.S. at 291 (construing similar language in the Travel Act). The Government has not disputed this point. The words composing the phrase "in violation of the laws of any State" are plainly understood individually and in concert. Thus, a plain reading of the statute indicates that an element of a substantive VICAR offense, when the predicate crime of violence is identified as a state-law offense, is that the defendant committed the violent act in violation of the laws of that State. Put differently,

if the alleged crime of violence did not violate the elements of a state law, it cannot form the basis for a VICAR charge. *Le*, 316 F. Supp. 2d at 360 n.11 (citing *United States v. Marino*, 277 F.3d 11, 30 (1st Cir. 2002)).

This straightforward approach to reading VICAR is best and, more importantly, consistent with the statutory text. VICAR makes it an offense, for example (and assuming the other elements are present), to commit murder "in violation of the laws of any State." The state law offense defines murder in the sense that it supplies the statutory text and essential elements of murder. Murder for the purposes of a VICAR charge is whatever the state law defines it to be.

The Government's proposed alternative construction—that a VICAR offense may be based on conduct that violates the so-called generic definition of the predicate crime of violence—finds no support in the text of the statute. On the contrary, it would render the phrase "in violation of the laws of any State or the United States" surplusage. Furthermore, it would create a myriad of unnecessary problems. The Government has asserted that the generic definition of a crime can be derived from federal law, state law, common law, and the model penal code. This approach invites contentious pretrial legal battles over the construction of those predicate offenses. And as this case has demonstrated, it leaves Defendants in the dark as to how to defend themselves against the charges until the eve of trial. Lastly, the Government's approach creates a greater risk of vacutur of any conviction as it would be convenient for Defendants to argue on appeal that the jury instructions did not properly cobble together an accurate definition of the generic predicate offense from the many available and potentially conflicting sources.

The Court's reading of the statutory text does not exhaust the inquiry. A few outstanding issues should be clarified. First, the state-law elements are necessary but they may not be sufficient.

*See Le*, 316 F. Supp. 2d at 363‒64 (concluding that elements of a proper state-law predicate need only correspond "in substantial part" to the generic definition of the offense).  For instance, West Virginia's statute criminalizing common law assault (i.e., assaults not accompanied by a battery) provides that it is an offense if "any person unlawfully attempts to commit a violent injury to the person of another or unlawfully commits an act which places another in reasonable apprehension of immediately receiving a violent injury." W. Va. Code § 61-2-9(b).  Use of a dangerous weapon is not an element of this offense.  Accordingly, if this offense were the predicate for a VICAR charge alleging an assault with a dangerous weapon in aid of racketeering, reason dictates that the Government would have to prove that the assault in violation of W. Va. Code § 61-2-9(b) was accomplished by use of a dangerous weapon.

A second conclusion that may be drawn from the text of VICAR's predicate offense element is that the Government need only prove that a defendant's actions violated the laws of one state.  The statute requires only that the predicate act be "in violation of the laws of *any* State."  18 U.S.C. § 1959(a) (emphasis added).  Several of the VICAR counts in the indictment list predicate offenses under more than one state in the same count.  The Government need not prove that the act violated the laws of each identified state; it may meet its burden by proving that the predicate offense was in violation of any one of the referenced states' laws.  Furthermore, the use of a state law to provide definitions for the predicate offenses does not open the door to that state's rules of procedure and evidence.  State procedures and rules of evidence have no place in a federal criminal prosecution, including one relying in part on state law.  *Cf. Carrillo*, 229 F.3d at 183.

Lastly, in case the point is not clear, the elements of the state-law predicates are not per se elements of VICAR.  *See United States v. Martinez*, 136 F.3d 972, 978 (4th Cir. 1998).  The

elements are relevant only for the purpose of ensuring that the Government has proven that Defendants accused of VICAR offenses have in fact committed acts which are "in violation of the laws of any State."  Accordingly, the state-law elements need not be alleged in the indictment, *Hamling v. United States*, 418 U.S. 87, 117 (1974), nor do they necessarily have to be included in the jury instructions.  Nevertheless, this Court will rely on the state-law elements when considering proposed guilty pleas and will heed the Second Circuit's advice to include them in any instructions to the jury on VICAR charges.  *See United States v. Pimentel*, 346 F.3d 285, 304 (2d Cir. 2003) ("[W]e again caution the Government and the district courts in this Circuit that the preferred practice in VCAR and RICO cases is to include those definitions [of predicate offenses] when charging the jury."); *accord Le*, 316 F. Supp. 2d at 359 n.7.

> E.  *Proper Substantive VICAR Predicates*

Now that it is decided that the Government must prove acts that violated state law when it charges VICAR in that manner, it must further be established whether the state laws charged in the indictment are proper predicates for the VICAR charges.   Defendants have challenged several of them on the grounds that they are not appropriate proper VICAR predicates.  VICAR proscribes several categories of prohibited violent crimes, such as murder, kidnaping, and assault with a dangerous weapon, only in general terms.  The statute relies on state and federal laws corresponding to the generally proscribed criminal actions to "define[] the unlawful conduct constituting the predicate offense." *Diaz*, 176 F.3d at 87.  In order to qualify as a VICAR predicate, the state statute must apply to acts that fall within the general categories of proscribed crimes of violence listed in

the statute.[20]  *Cf. Nardello*, 393 U.S. at 295 (construing similar language in the Travel Act).  The

standard by which a state statute charged as a VICAR predicate should be evaluated is cogently

explained in a recent decision from the Eastern District of Virginia:

> [W]hile it is true that a defendant cannot be found to have violated § 1959 unless the
> alleged violent conduct violated a state law, it is not proper in making this
> determination to rely exclusively on a comparison between the elements of the state
> statute and the elements of the violent crime under federal law.  Instead, the proper
> comparison is between the elements of the state statute and the elements of the
> violent crime, as it is generically defined. . . . [I]n making this comparison, a court
> need not find that the elements are precisely the same, but instead  must determine
> whether the state offense, regardless of how it is labeled, "corresponds in substantial
> part" to the violent conduct.

*Le*, 316 F. Supp. 2d at 362 (quoting *Taylor v. United States*, 495 U.S. 575, 599 (1990)) (footnote

omitted).

With this guidance, the Court will review the substantive state offenses cited as VICAR

predicates in the indictment, ignoring for now the additional issues presented by VICAR

conspiracies.  Special attention will be paid to assaults with a dangerous weapon, as counts charging

assaults as VICAR predicates have proven particularly troublesome to the orderly progression of

this case.

### 1.  *Assault with a Dangerous Weapon*

Several of the VICAR counts allege that the Defendants committed an assault with an

dangerous weapon.  Counts Three, Six, and Fourteen cite West Virginia's general assault, battery,

---

[20]  The Court recognizes that the state statutes serving as VICAR predicate need not be identified
in the indictment.  *See United States v. Martinez*, 136 F.3d 972, 978 (4th Cir. 1998).  The
Government chose to cite them in the indictment in this case, however, which is a practice that is
to be encouraged in any criminal case that relies on state-law predicate offenses.  The Court will
assume that the state statutes identified as predicate offenses in the indictment are those the
Government will attempt to prove at trial.  Doing so is fair to the Defendants as they prepare for trial
and it avoids potential complaints of constructive amendment of the indictment.

and wounding statute, W. Va. Code § 61-2-9, as a predicate.  Count Three also charges a violation

of Ohio's felonious assault statute, Ohio Rev. Code Ann. § 2903.11(A), and Count Six additionally

charges a violation of Virginia's assault and battery statute, Va. Code Ann. § 18.2-57.  Count

Fourteen adds a citation to New Jersey's aggravated assault statute, N.J. Stat. Ann. § 2C:12-1(b).

The first task is to ascertain the scope of assault with a dangerous weapon as that term is

employed by the VICAR statute.  In modern legal or colloquial usage, assault often is used as short-

hand for what traditionally would have been deemed assault and battery.  *See* Black's Law

Dictionary 122 (8th ed. 2004) (defining assault, inter alia, as, "Loosely, a battery"); *see also State

v. Arbruzino,* 68 S.E. 269, 270 (W. Va. 1910) (finding that a jury understood "assault" to mean "hit,

beat and wound" rather than its "technical, common law" meaning).  Congress and other federal

authorities typically use "assault" in this sense, as a synonym for battery or wounding.  *See, e.g.*, 18

U.S.C. § 113 (setting penalty for "assault by striking, beating, or wounding"); U.S. Sentencing

Guidelines Manual § 2A2.2 cmt. n.1 (defining "aggravated assault" as "an assault involving . . .

serious bodily injury").  For this reason, VICAR's "assault with a dangerous weapon" provision has

been understood as applying to battery-type assaults.  *Cf. United States v. Khalil*, 279 F.3d 358, 367

& n.2 (6th Cir. 2002).

Furthermore, "courts have uniformly recognized that various federal statutes criminalizing

'assault' incorporate the long-established common law definition of that term." *United States v.

Passaro*, 577 F.3d 207, 217‒18 (4th Cir. 2009).  Common law assaults therefore may serve as

predicate acts for VICAR charges.  *See Le*, 316 F. Supp. 2d at 363‒64.

In its traditional common law usage, the term "assault" encompasses two types of actions.

It can refer either to an unsuccessful attempted battery or to a threatening act which places another

45

person in reasonable apprehension of an imminent physical harm.  *See* William Blackstone, 3 Commentaries *120 (defining tort of assault as "an attempt or offer to beat another, without touching him: as if one lifts up his cane, or his fist, in a threatening manner at another; or strikes at him, but misses him"); Blackstone, 4 Commentaries *270 (noting that the tortious assaults are indictable as public offenses); *see also United States v. Kirksey*, 138 F.3d 120, 125 (4th Cir. 1998) (discussing assault under Maryland law, which incorporates the traditional common law definition).  The actus reus of a common law assault is some physical act that signifies to the victim that the aggressor has the present ability to cause the threatened harm and that the harm may be imminent.  6 Am Jur. 2d Assault and Battery § 24 (1999).  Words unaccompanied by threatening actions cannot constitute a common law assault.[21]  *Golesorkhi v. Lufthansa German Airlines*, No. 96-2211, 1997 WL 560013, at *2, 1997 U.S. App. LEXIS 23747, at *5 (4th Cir. Sept. 10, 1997) (unpublished) (discussing common law assault in context of Virginia law); *State v. Hatfield*, 37 S.E. 626, 631 (W. Va. 1900); *Smith v. John Deere Co.*, 614 N.E.2d 1148, 1154 (Ohio Ct. App. 1993).

Assaults are not chargeable under VICAR unless they are committed with a dangerous weapon or resulted in serious bodily injury.  18 U.S.C. § 1959(a).  It is axiomatic that an assault cannot be an assault *with* a dangerous weapon unless a dangerous weapon is used to commit the assault.  The text of VICAR states, "Whoever . . . assaults with a dangerous weapon" has committed

---

[21]  The concept of a "conditional assault" has been raised by the parties, namely the Government and Defendant Stover.  (Docket 1449, at 14.)  As those parties correctly noted, an assault may occur even if the victim is given an ultimatum.  For example, the stating of a condition such as, "Give me your money or I'll shoot," does not make the gun pointed menacingly at the victim any less of an assault.  This is sometimes called a conditional assault.  However, a threatening verbal ultimatum without a corresponding threatening *act* is not an assault, conditional or otherwise.  The key element of a common law assault is the threatening act.  Whether this act is accompanied by a stated condition is irrelevant.  Thus, if properly understood, the idea of a "conditional assault" is of little use here.

the offense.  "Assault with a dangerous weapon" is a legal term of art with a readily understood meaning.  *Cf.* Black's Law Dictionary 122 (8th ed. 2004) (containing a dictionary entry for "assault with a dangerous weapon").  It would require a tortured and unreasonable reading of the statute to reach the conclusion that the phrase "with a dangerous weapon" modifies "whoever" rather than "assault" such that liability could be predicated on simple possession of a weapon.  Thus, for a battery-type assault, the weapon would have to make contact with the victim to constitute an assault with a dangerous weapon.  For common law assaults, the weapon would have to be utilized in such a manner that its harmful use is attempted or the victim is placed in reasonable apprehension that the weapon may be put to harmful use imminently.  *Cf. Hatfield*, 37 S.E. at 631–32 ("Standing in the position Hatfield did relate to that of Ellis, his gun pointed down with his hand on the lock and a part of the time at least the gun cocked, and  which could be raised in position to shoot quite as quick as a flash of lightning, it was nothing short of a malicious assault . . . .").  The mere possession of an object capable of being a dangerous weapon by a party committing a common law assault does not make the offense an assault with a dangerous weapon unless the weapon is brandished, wielded, or used in some manner in connection with the assault.  For example, a lout who raises an open hand threateningly as if to smack a victim has committed an assault.  That assault would not be converted into an assault with a dangerous weapon if he also happened to have a pistol secreted in his pocket.

Neither VICAR nor the federal statute covering assaults with a dangerous weapon generally, 18 U.S.C. § 113, expressly define "dangerous weapon."  Courts follow a commonsense approach, finding that an object may be a dangerous weapon if it is capable of causing serious physical harm in the manner employed or if it is capable of instilling fear of physical harm in the manner employed.  *See United States v. Sturgis*, 48 F.3d 784, 787 (4th Cir. 1995) (citing *McLaughlin v.*

*United States*, 476 U.S. 16, 17‒18 (1986)).  Some objects are inherently dangerous, of course, but

nearly any object has the capacity to be a dangerous weapon.  What distinguishes an innocuous item

from a dangerous weapon is "the manner of its use."  *Id*. (quoting *United States v. Johnson*, 324 F.2d

264, 266 (4th Cir. 1963)).

With the general definition of assault with a dangerous weapon in mind, the Court turns to

the state law offenses charged in the indictment as the VICAR predicates.

West Va. Code § 61-2-9 is a predicate offense for three VICAR counts in the indictment.

Section 61-2-9 covers all manners of assaults and batteries.  It states, in pertinent part:

> (a) If any person maliciously shoot, stab, cut or wound any person, or by any means
> cause him bodily injury with intent to maim, disfigure, disable or kill, he shall . . .
> be guilty of a felony . . . .
> (b) Assault.  If any person unlawfully attempts to commit a violent injury to the
> person of another or unlawfully commits an act which places another in reasonable
> apprehension of immediately receiving a violent injury, he shall be guilty of a
> misdemeanor . . . .
> (c) Battery.  If any person unlawfully and intentionally makes physical contact of an
> insulting or provoking nature with the person of another or unlawfully and
> intentionally causes physical harm to another person, he shall be guilty of a
> misdemeanor . . . .

W. Va. Code § 61-2-9.  Subsection (a) clearly corresponds to elements of a battery-type assault with

a dangerous weapon.  *See State v. Gibson*, 68 S.E. 295, 295‒96 (W. Va. 1910).  Subsection (b)

mirrors the definition of common law assaults.  Such assaults can be perpetrated with a dangerous

weapon under West Virginia precedent.  *See Hatfield*, 37 S.E. at 631‒32.  Subsection (c) refers to

simple batteries that could be accomplished with dangerous weapons.  Therefore, § 61-2-9 is a

proper VICAR predicate offense.

Ohio Rev. Code Ann. § 2903.11(a), "felonious assault," is listed as a predicate offense in

Count Three.  This statute provides, in relevant part: "No person shall knowingly . . . [c]ause serious

physical harm to another [or] [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." Ohio Rev. Code Ann. § 2903.11(a). Section 2903.11(a) is a proper VICAR predicate, as it expressly covers battery- and attempted battery-type assaults with dangerous weapons. *Khalil*, 279 F.3d at367 n.2. This statute is problematic, however, if it is used as a predicate for acts that fall into the category of common law threat-type assaults. It is true, as the Government highlights, that Ohio cases have upheld convictions under § 2903.11(a) for facts that superficially look like common law threat-type assaults. *See State v. Tate*, 377 N.E.2d 778 (Ohio 1978) (per curiam); *State v. Zackery*, 511 N.E.2d 135 (Ohio Ct. App. 1987) (per curiam). However, more recent Ohio precedent clarifies that § 2903.11(a) is an improper vehicle to prosecute traditional threat-type assaults. In *State v. Brooks*, the Supreme Court of Ohio observed that a necessary element of § 2903.11(a) is the intent to cause actual physical harm. 542 N.E.2d 636, 642 (Ohio 1989). The court noted that the act of pointing a deadly weapon at another person is not an offense under § 2903.11(a) unless the defendant intended to cause physical harm. *Id.* at 642–43. If this intent is present, the act of pointing the weapon at the victim is one step in an attempt to cause physical harm. But if the defendant's intent for pointing the weapon at the victim was merely to create fear of an imminent battery, the proper offense is "aggravated menacing" under Ohio Rev. Code Ann. § 2903.21. *Id.* ("[T]he pointing of a deadly weapon would undoubtedly justify a jury in concluding that the accused had committed the offense of 'aggravated menacing' . . . ."). The aggravated menacing statute, which is not charged in the indictment, provides in part, "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the

49

person." Ohio. Rev. Code § 2903.21(a).  Aggravated menacing is therefore the proper Ohio statute for most common law threat-type assaults.[22]

Va. Code Ann. § 18.2-57 is a predicate for Count Six.  This statute provides, in relevant part: "Any person who commits a simple assault or assault and battery shall be guilty."  Va. Code Ann. § 18.2-57(a).  Virginia relies on common law definitions of assault and battery.  A simple assault "occurs when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm *or* engages in an overt act intended to place the victim in fear or apprehension of bodily harm and creates such reasonable fear or apprehension in the victim." *Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2005) (emphasis in original).  This definition encompasses assaults committed with a dangerous weapon.  *Commonwealth v. Alexander*, 531 S.E.2d 567, 568 (Va. 2000) ("The threat to use deadly force by brandishing a deadly weapon has long been considered an assault."); *Harper v. Commonwealth*, 85 S.E.2d 249, 255 (Va. 1955) (noting that "levelling [sic] a gun at another" would be assault); *Agee v. Commonwealth*, 578 S.E.2d 68, 128–29 (Va. Ct. App. 2003) (finding sufficient evidence of assault where defendant assumed a firing stance and "racked" his firearm).  Virginia's common law definition of battery is "the actual infliction of corporal hurt on another (e.g., the least touching of another's person), willfully or in anger, whether by the party's own hand, or by some means set in motion by him."  *Adams v.*

---

[22]  Based on the Government's representations at the May 4 hearing and the joint stipulations of fact attached to Defendants Bumgarner and Stover's plea agreements, it appears that the Government's theory of Count Three is that the PMC and LRMC members charged in that count conspired to commit a common law assault against the RDMC members by putting them in fear of an imminent battery.  It is not evident from the record that the object of the conspiratorial agreement was to commit a battery-type assault with a dangerous weapon.  This raises questions about the factual basis for Stover's plea, and possibly Bumgarner's as well, as they are predicated on Ohio's felonious assault statute.  It is unclear whether the root of this problem is with how Count Three is charged, with the factual assertions currently in the record, or with both.

*Commonwealth*, 534 S.E.2d 347, 350 (Va. Ct. App. 2000).  This definition is broad enough to cover batteries committed with dangerous weapons.  *See id.* at 351; *see also* Va. Code Ann. § 18.2-54 (stating that assault and battery is a lesser included offense of malicious shooting, stabbing, cutting, or wounding); *Commonwealth v. Vaughn*, 557 S.E.2d 220, 222 n.3 (Va. 2002) (criticizing trial court for refusing to instruct jury on assault and battery "as a matter of law because a weapon was involved"); *Boone v. Commonwealth*, 415 S.E.2d 250, 250–52 (Va. Ct. App. 1992) (holding that jury should have been instructed on assault and battery in case where defendant beat and severely injured victim with a "two by four" board).  It is evident that Va. Code Ann. § 18.2-57 is a proper VICAR predicate as it may apply to all manners of assaults with a dangerous weapon.

New Jersey's aggravated assault statute, N.J. Stat. Ann. § 2C:12-1(b), is cited as a predicate for Count Fourteen.  The statute applies to an extensive list of criminal activities.  For present purposes, the subsection that appears to be relevant provides, "A person is guilty of aggravated assault if he . . . [a]ttempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon."  N.J. Stat. Ann. § 2C:12-1(b)(2).  "Bodily injury" is defined as "physical pain, illness or any impairment of physical condition."  N.J. Stat. Ann. § 2C:11-1(a).  This statute is a proper VICAR predicate offense, as it unambiguously applies to general attempted battery- and battery-type assaults carried out with a dangerous weapon.  It would not apply to common law threat-type assaults, which are covered by a different section of New Jersey's broad assault statute.  That section classifies as simple assaults "[a]ttempts by physical menace to put another in fear of imminent serious bodily injury."  N.J. Stat. Ann. § 2C:12-1(a)(3).  Simple assault does not include the use of a dangerous weapon as an element, but the offense may be committed with a dangerous weapon.  *Frazier v. N. State Prison*, 921 A.2d 479, 482–83 (N.J. Super. Ct. App. Div. 2007).

2. *Murder*

Count Five identifies the predicate crime of violence as murder.  The predicate offenses are cited as W. Va. Code § 61-2-1 and Ky. Rev. Stat. § 507.020.

A general definition of murder may be constructed without difficulty.  Federal law defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a); *see also Lewis v. United States*, 523 U.S. 155, 169 (1998); *Stevenson v. United States*, 162 U.S. 313, 320‒21 (1896).  This definition of murder is faithful to the common law definition of murder, which described murder as "when a person of sound memory and discretion, unlawfully killeth any [person] with malice aforethought."  William Blackstone, 4 Commentaries *195 (quoting an earlier treatise by Sir Edward Coke).  Malice generally means an intent to kill or cause serious bodily harm.  *See United States v. Lewis*, 111 F. 630 , 632‒33 (C.C.W.D. Tex. 1901); *see also Stevenson*, 162 U.S. at 320.    Thus, a general definition of murder can be stated as the malicious, meaning intentional, killing of another person without a legal justification.

West Virginia's murder statute states: "Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, [any listed felony] is murder of the first degree.  All other murder is of the second degree." W. Va. Code § 61-2-1.  The statute does not define murder, relying instead on the common law definition.  *See State v. Guthrie*, 461 S.E.2d 163, 179 (W. Va. 1995) (noting that W. Va. Code § 61-2-1 divides common law murder, which was expansive in scope, into degrees of murder).  As at common law, murder under West Virginia law is defined as any unlawful killing with malice. *State ex rel. Combs v. Boles,* 151 S.E.2d 115, 118 (W. Va. 1966).  Accordingly, W. Va. Code §

61-2-1 is a proper VICAR predicate as it criminalizes acts that fall within the general definition of murder.

Kentucky's murder statute provides, in relevant part, that a person is guilty of murder when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." Ky. Rev. Stat. § 507.020(1)(a). This statute applies to any killing that is either intentional or wanton, unless some mitigating factor should make it a lesser offense or some defense should make the killing lawful. *See Smith v. Commonwealth*, 737 S.W.2d 683, 687–89 (Ky. 1987). Ky. Rev. Stat. § 507.020 therefore may serve as a VICAR predicate, as it differs little from the general definition of murder.

### 3. Kidnapping

Count Nine and Defendant Morris's information are founded on predicate acts of kidnapping in violation of W. Va. Code § 61-2-14a.

At common law, kidnapping "meant to take and carry a person by force and against his will." *United States v. Young*, 512 F.2d 321, 323 (4th Cir. 1975). Kidnapping traditionally applied only when the victim was forcibly removed from the country, whereas lesser detentions fell under the offense of false imprisonment. William Blackstone, 4 Commentaries *218–19. The current federal statute on the matter merges these two concepts under the title of kidnapping. Kidnapping is set forth in the United States Code as applying to any person who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person," provided that there is some connection to interstate or foreign commerce. 18 U.S.C. § 1201(a). The federal statute accurately reflects the common modern understanding of kidnapping as referring either to the seizing and moving of a person to another location against his will or

otherwise unlawfully restraining a person's liberty and freedom of movement.  *Cf.* Merriam-Webster's Collegiate Dictionary 641 (10th ed. 1998) (defining "kidnapping" as "to seize and detain or carry away by unlawful force or fraud and often with a demand for ransom").

W. Va. Code § 61-2-14a states, in relevant part: "Any person who, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this state or within this state, or otherwise kidnap any other person . . . shall be guilty of a felony." West Virginia's courts acknowledge that the state statute is very similar in effect to the federal statute.  *Pyles v. Boles*, 135 S.E.2d 692, 687 (W. Va. 1964).  Both statutes cover acts falling within the general ambit of kidnapping in that they apply to persons who move a victim against his will and to persons who otherwise unlawfully restrain the liberty of a victim.  It is evident then that W. Va. Code § 61-2-14a is a proper VICAR predicate for kidnapping.

### 4.  *Crime of Violence*

Counts Ten and Twelve charge certain Defendants with threatening to commit a crime of violence in aid of racketeering.  The predicate crime of violence for both counts is identified as West Virginia's assault and battery statute, W. Va. Code § 61-2-9, which was discussed previously.

The term "crime of violence" is defined, in part, for federal offenses as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 16(a).  In determining whether an offense is a crime of violence, the Court first looks to the elements of the offense rather than to the nature of conduct by which the accused allegedly committed the offense.  *Leocal v. Ashcroft,* 543 U.S. 1, 7 (2004); *see also United States v. Aragon*, 983 F.2d 1306, 1311(4th Cir. 1993) (holding that determination is a question of law, not fact).  If the statute is ambiguous as to whether or not the use of physical force is an

element, or the statute may be divided into parts that are violated by use of physical force and parts that are not, the Court may look to the underlying facts to determine if it is a crime of violence. *United States v. Simms*, 441 F.3d 313, 315 (4th Cir. 2006); *Daly v. Gonzales*, 129 F. App'x 837, 843–44 (4th Cir. 2005) (unpublished).

W. Va. Code § 61-2-9 cannot be classified categorically as a crime of violence under 18 U.S.C. § 16, although parts of it may be.  Section 61-2-9(a) clearly is a crime of violence as it requires, as an element, a malicious or unlawful intent to "shoot, stab, cut, or wound" or to "cause . . . bodily injury with intent to maim, disable or kill."[23]  Section 61-2-9(c), which applies to simple battery, may or may not be a crime of violence.  Subsection (c) applies to "mak[ing] physical contact of an insulting or provoking nature with the person of another," and to "intentionally caus[ing] physical harm to another person."  W. Va. Code § 61-2-9(c).  Simple batteries that are committed by minor touching of an insulting or provoking nature generally do not constitute crimes of violence. *See Kirksey*, 138 F.3d at 125 (construing Maryland battery statute similar in scope to West Virginia's); *see also Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1017 (9th Cir. 2006) ("We have held that conduct involving mere offensive touching does not rise to the level of a 'crime of violence' within the meaning of 18 U.S.C. § 16(a).").  The latter part of subsection (c), which is violated by intentionally causing harm to a person, would fall within 18 U.S.C. § 16(a)'s definition of crime of violence because it includes as an element the use of physical force against a person.

---

[23] Section 61-2-9(b), which applies to attempted battery or threat-type common law assaults, is not relevant here.  Counts Ten and Twelve charge a threat to commit a crime of violence.  It would be illogical for the indictment to allege that Defendants threatened the victims with an *attempted* battery or a *threatened* injury rather than threatening the victims with an *actual* battery or injury.

Accordingly, W. Va. Code § 61-2-9 section is a proper VICAR predicate for Counts Ten and Twelve, except in the unlikely event that the facts indicate that the alleged crime of violence threatened was a simple battery accomplished by merely offensive touching.

### F.  Proving a VICAR Conspiracy

Having already established that the Government must prove the elements of the substantive VICAR crimes of violence, the Court must now address whether the Government also must prove the state-law elements of conspiracy, where, as it did here, the Government cites state conspiracy statutes in the indictment.  The question presented here is whether the phrase in VICAR "or . . . conspires so to do" is intended to incorporate substantive state conspiracy law.  Or, conversely, does federal conspiracy law supply the standard for VICAR conspiracies?  This question has been raised in a number of cases, but there is no authority providing a definitive answer.  *See, e.g.*, *United States v. Desena*, 287 F.3d 170, 177 n.1 (2d Cir. 2002) ("Although the government may rely on either state or federal law to establish a predicate substantive crime, it is unclear whether § 1959 imports state law of attempt and conspiracy or whether federal law governs.").  The Fourth Circuit has not directly addressed this question.[24]

Where this issue has been raised, courts typically have been able to avoid confronting the question directly.  In most instances, it is merely academic to determine whether state or federal conspiracy law is implicated by a VICAR conspiracy charge because the differences between the two bodies of conspiracy law generally are not material.  *See, e.g.*, *Marino*, 277 F.3d at 31–32 (1st

---

[24] Two district courts within this circuit have reached opposite conclusions on the matter.  *Compare United States v. Gardner*, 417 F. Supp. 2d 703, 711 (D. Md. 2006) (relying on "general conspiracy law," rather than state conspiracy law, to formulate elements of VICAR conspiracy), *with United States v. Le*, 310 F. Supp. 2d 763, 783 (E.D. Va. 2004) ("It is apparent . . . that § 1959 incorporates state law with respect to conspiracies and attempts . . . .").

Cir. 2002); *Carrillo*, 229 F.3d at 186.  Unfortunately, the issue is unavoidable in this case at this stage of the proceedings.  The question has arisen out of the context of a proffered guilty plea to Count Three, although the answer also will impact those Count Three Defendants who intend to go to trial and those Defendants charged with VICAR conspiracies in Counts Five, Six, and Nine.

As has been discussed above, Count Three charges a conspiracy to commit assault with a dangerous weapon.  The alleged factual basis for this count is that a conspiracy was formed in West Virginia to commit an assault with a dangerous weapon in Ohio.  The participants allegedly traveled to Portsmouth, Ohio, where members of a rival motorcycle club were confronted and possibly assaulted.  Count Three identifies the assault statutes of West Virginia and Ohio as the predicate crimes of violence which were the object of the conspiracy.  The indictment also charges West Virginia's conspiracy statute as a predicate.[25]  The inclusion of West Virginia's conspiracy statute in Count Three as a VICAR predicate is curious, as the indictment does not also include Ohio's conspiracy statute.  The result has been a raft of complications.  For example, at one point in the May 4 hearing, the Government conceded that it would attempt to prove Count Three as a West Virginia conspiracy and ignore Ohio law altogether, although it later backtracked on this assertion.  The thorny question the Government's possible concession raises is this: As a matter of West Virginia law, is a conspiracy formed in West Virginia to commit an offense in Ohio a violation of West Virginia conspiracy law?  If it is not, then must the Government prove a conspiracy under the law of Ohio?  Further, must an overt act be alleged in the indictment and proven?  For reasons that

---

[25]  This statute states, in pertinent part, "It shall be unlawful for two or more persons to conspire . . . to commit any offense against the State . . . if . . . one or more of such persons does any act to effect the object of the conspiracy."  W. Va. Code § 61-10-31.

should become apparent, these questions and others raised at the hearing are inconsequential because state conspiracy law is irrelevant in the context of a VICAR conspiracy.

VICAR says, in part, "Whoever . . . murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, *or attempts or conspires so to do*" shall be guilty of an offense.  18 U.S.C. § 1959(a) (emphasis added).  The conspiratorial provision of VICAR is ambiguous inasmuch as it is plausible to read "or conspires so to do" as meaning a conspiracy "in violation of the laws of any State" or as meaning simply a conspiracy, without such qualification.  Neither grammar nor any of the customary canons of statutory construction compel either conclusion.  However, two reasons lead this Court to the conclusion that "conspires so to do" is not modified by "in violation of the laws of any State."

If the intent of Congress in drafting VICAR was to incorporate state conspiracy law, it could have done so plainly by placing the conspiratorial provision before the "in violation of any State" phrase.  For example, the statute could have read, "Whoever . . . commits, attempts, or conspires to commit murder . . . in violation of the laws of any state . . . shall be punished."  Rather, Congress chose to place the conspiratorial provision after the state law phrase.  This suggests, albeit weakly, that Congress did not intend for the conspiracy provision to be modified by the phrase incorporating the state law definitions of the substantive predicates.

A second more persuasive reason compels the conclusion that VICAR conspiracies should be adjudicated under federal, rather than state, conspiracy law.  The rules of statutory construction, helpful though they may be, are "subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and

will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." *SEC v. Joiner*, 320 U.S. 344, 350-51 (1943). The purpose of VICAR is to complement RICO, *Rogers,* 89 F.3d at 1335, by giving law enforcement another arrow in its quiver to take down organized crime enterprises operating in interstate commerce. It should be construed to effectuate this purpose.

VICAR is targeted primarily at criminal activities that traditionally are within the purview of state law enforcement. However, Congress recognized when enacting VICAR that such organizations operate in a manner, often across multiple states, that would frustrate local law enforcement efforts:

> [T]he need for Federal jurisdiction is clear, in view of the Federal Government's strong interest, as recognized in existing statutes, in suppressing the activities of organized criminal enterprises, and the fact that the FBI's experience and network of informants and intelligence with respect to such enterprises will often facilitate a successful Federal investigation where local authorities might be stymied.

H.R. Rep. No. 98-1030, at 305, *reprinted in* 1984 U.S.S.C.A.N. 3182, 3484. Consonant with this purpose, the Court's interpretation of VICAR should not be such that federal prosecutions of violent crimes in aid of racketeering are subject to the same structural and jurisdictional limitations that would hamper a state prosecution of the underlying crimes of violence. This point takes on added importance in situations such as this where an enterprise's alleged conspiratorial activities extend across state lines. Jurisdictional problems are avoided if VICAR's conspiracy language refers to one conspiracy under federal law rather than incorporating state conspiracy law or laws.

The inherent problem with relying on state conspiracy law for VICAR conspiracies can perhaps best be exemplified in the hypothetical. Suppose members of a criminal enterprise located entirely in State A conspired to commit a murder in State B. The conspiracy is stopped by law

enforcement in State A before the plot is carried out.  Assuming no criminal acts ever occurred in State B, no prosecution could be initiated there.  *Cf. State v. McAllister*, 63 S.E. 758, 759–61 (W. Va. 1909) (vacating robbery conviction where no element of offense occurred within West Virginia).  Unless State A's conspiracy law made it an offense to conspire to commit an offense against another state—a highly doubtful proposition[26]—no prosecution could occur in that state either.  This hypothetical conspiracy ideally should fall within the purview of federal law and be the subject of a federal prosecution.  If, however, VICAR's conspiracy language incorporates the conspiracy laws of the states in which the conspiracy occurred, no VICAR charges could be lodged against the conspirators because their actions were not "in violation of the [*conspiracy*] laws of any State."  Clearly, this is not a result contemplated by Congress when it enacted VICAR.

The more reasonable interpretation of the statute is to read VICAR's "conspires so to do" phrase as creating an independent federal conspiracy offense, much like RICO's conspiracy provision.  *See* 18 U.S.C. § 1962(d).  Construed this way, the gist of a VICAR conspiracy is a conspiratorial agreement—irrespective of where it is formed—to commit an act of violence which would be a violation of a state law (or several states' laws) if it were carried to fruition.  This construction of VICAR's conspiracy language gives effect to its federal purpose.  Suppose, for example, members of an enterprise located in various states planned during a teleconference to meet in State X, seize a rival from his home, bundle him into a trunk, and drive him through State Y to

_____

[26] West Virginia's conspiracy law, W. Va. Code § 61-10-31, is typical of state conspiracy statutes as it is modeled on the federal general conspiracy statute, 18 U.S.C. § 371.  *State v. Johnson*, 371 S.E.2d 340, 350 (W. Va. 1988).  This statute makes it an offense "to conspire . . . to commit any offense *against the State*."  W. Va. 61-10-31 (emphasis added).  Although the Court could locate no authority directly on point, it is unlikely that West Virginia's statute could support a conspiracy charge for an agreement to commit an offense against a foreign state; an offense against Ohio is not an offense against West Virginia.

a destination in State Z.  There is but one conspiracy, and the Government should have only to prove the conspiracy under one set of laws—namely, VICAR's conspiracy provision.  The effect of this conspiracy, if its object were completed, would be a violation of the kidnapping laws of states X, Y, and Z.  The laws of all three states therefore could serve as substantive predicates for the VICAR offense.  A conviction could be secured if the Government proved, along with the other VICAR elements, that the object of the conspiracy would have violated the laws of any one of those states if it were completed.  This hypothetical situation, and the one in the paragraph above, highlight how Congress's intent in passing VICAR is best effectuated if state conspiracy law is irrelevant to the offense.  For this reason, the Court finds that citations to state conspiracy law in the VICAR conspiracy counts of the indictment are surplusage.  *See Owens v. United States*, 236 F. Supp. 2d 122, 129 (D. Mass. 2002), *aff'd in relevant part*, 483 F.3d 48 (holding with respect to a VICAR predicate that "the Court may drop from the indictment surplusage, so long as the essential elements of the crime charged remain"); *cf. Martinez*, 136 F.3d at 978 (holding that a VICAR indictment need not cite the predicate state statutes).

The next question then is whether VICAR requires an overt act in furtherance of the conspiracy.  The Supreme Court's reasoning in *Salinas* should apply to VICAR with the same force it applied to RICO.  *See supra* Part IV.  *Salinas* compared RICO's conspiracy language to the general federal conspiracy statute, 18 U.S.C. § 371.  522 U.S. at 63.  Section 371 provides that a conspiracy becomes indictable when "two or more persons conspire . . . to commit any offense against the United States . . ., and one or more of such persons do any act to effect the object of the conspiracy."  In contrast to § 371, RICO's conspiracy section does not contain an express requirement of an overt act in furtherance of the conspiracy.  *See* 18 U.S.C. § 1962(d) ("It shall be

unlawful for any person to conspire to violate any of the provisions of [the substantive sections of RICO].").  The *Salinas* Court reasoned that the conspicuous absence of an overt act requirement from RICO's conspiracy provision indicated Congress's intention to use the word "conspire" in its modern usage; that is, as being a complete offense upon the formation of an agreement to commit or facilitate the substantive crime.  *Salinas*, 522 U.S. at 63‒65.

Like RICO, VICAR's conspiracy provision contains no mention of an overt act requirement. 18 U.S.C. § 1959(a) ("or attempts or conspires so to do").  It follows that Congress did not intend for an overt act to be alleged or required to prove a VICAR conspiracy.[27]  *Accord Gardner*, 417 F. Supp. 2d at 711 n. 7 ("Just as there is no distinct 'overt act' requirement for proof of a defendant's participation in a RICO conspiracy, there is no distinct 'overt act' requirement for proof of a defendant's participation in a VICAR conspiracy.").

For the reasons set forth above, the Court finds that the Government must prove the following elements beyond a reasonable doubt to establish a VICAR conspiracy: (1) an enterprise existed; (2) the enterprise was engaged in racketeering activity; (3) the defendant had a position in that enterprise; (4) the defendant conspired with one or more other persons; (5) the object of the conspiracy was to commit a predicate crime of violence;[28] and (6) the defendant did so for the

---

[27]  Similarly, proof of an overt act is not required for convictions under other federal conspiracy statutes that do not include express overt act requirements.  *See, e.g.*, *United States v. A-A-A Electrical Co.*, 788 F.2d 242, 245 (4th Cir. 1986) (listing 21 U.S.C. § 846 and 18 U.S.C. § 1962(d), § 2384 as examples); *United States v. Bailes*, 120 F. Supp. 614, 618 (S.D. W. Va. 1954) (18 U.S.C. § 241) (Watkins, J.).

[28]  The Government has repeatedly emphasized, particularly with reference to Count Three, that it need not prove that a conspiracy's objective was completed to prove a VICAR conspiracy charge. This is true.  Nevertheless, the events that occurred subsequent to the forming of the conspiratorial agreement are not wholly irrelevant, as those events may provide circumstantial evidence of the

(continued...)

general purpose of gaining entrance to or maintaining or increasing his position in the enterprise. *Cf. Fiel*, 35 F.3d at 1003 (stating the elements of a substantive VICAR offense generally). Furthermore, to establish the predicate crime of violence for a VICAR conspiracy, the evidence must show that the object of the conspiracy, if it were carried out to completion, (1) would constitute the proscribed violent crime, as it is generically defined, and (2) would be a violation of a state law corresponding to that violent crime.

### G.  Requisite Effect on Interstate Commerce

Federal jurisdiction over VICAR offenses is predicated on the enterprise's nexus to interstate or foreign commerce.  VICAR incorporates this jurisdictional requirement into the definition of "enterprise," which means "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).  This is substantially the same wording by which RICO sets forth its requisite nexus with commerce, 18 U.S.C. § 1962(c) ("enterprise engaged in, or the activities of which affect, interstate or foreign commerce"), and should be afforded the same scope, *see* H.R. Rep. No. 98-1030, at 307, *reprinted in* 1984 U.S.S.C.A.N. 3182, 3486 (stating intent that "the term enterprise [in VICAR] have the same scope" as it does in RICO).  Thus, only a "minimal" effect on commerce is required to establish federal jurisdiction.  *Gray*, 137 F.3d at 773.  As with RICO, a defendant's knowledge of the interstate commerce nexus is irrelevant.  See *Darby*, 37 F.3d at 1067.

---

[28](...continued)
nature of the underlying agreement. *Cf. Iannelli v. United States*, 420 U.S. 770, 778 n.10 (1975) (noting that agreement element of conspiracies can "be inferred from the facts and circumstances").

## VI.  TRAVEL ACT

Counts Seven, Eight, Eleven, and Racketeering Acts Five, Six, and Eight of Count One, allege violations of 18 U.S.C. § 1952 and § 2.  Section 1952 is commonly known as the Travel Act. It is alleged in the superseding indictment that members of the PMC operated an interstate gambling enterprise in violation of the laws of Pennsylvania, New Jersey, Maryland, Florida, and West Virginia.  On an annual basis, PMC members allegedly were ordered to sell a quantity of raffle tickets in these states that gave the purchaser a purported chance to win a motorcycle.  It is unclear if the motorcycle existed or if anybody ever won.  The proceeds of the ticket sales were delivered by various PMC members to Defendant Floyd Moore in West Virginia, who in turn delivered them to the PMC president, Defendant Barbeito, in Maryland.  The Government contends that the proceeds of the illegal raffles were used to promote the PMC as a criminal enterprise.  Defendants are charged with traveling in interstate commerce or using an interstate facility to distribute the proceeds of the gambling enterprise or, alternatively, with aiding and abetting such travel.

A number of PMC members are implicated in the Travel Act counts, including Defendants Barbeito, Nuss, Floyd Moore, and William Hankins.  Additionally, sixteen other Defendants initially charged with Travel Act violations in connection with the raffles have been dismissed from this case in exchange for pleading guilty to state misdemeanor offenses in the Circuit Court of Kanawha County, West Virginia.

### A.  Travel Act Elements

The Travel Act provides, in pertinent part, "Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . distribute the proceeds of any unlawful activity . . . and thereafter performs or attempts to perform

. . . [the act of distributing the proceeds]," shall be guilty of the offense.  18 U.S.C. § 1952(a).  The

term "unlawful activity" is defined by the statute as, inter alia,  "any business enterprise involving

gambling . . . in violation of the laws of the State in which they are committed."  18 U.S.C. §

1952(b)(1). With respect to a Travel Act offense based on the distribution of gambling proceeds,

three essential elements are evident from the statutory text: (1) travel in interstate or foreign

commerce or the use of any facility of interstate or foreign commerce; (2) intent to distribute the

proceeds of an unlawful activity, that is, a business enterprise involving gambling; and (3) the

subsequent distribution or attempted distribution of the proceeds.  *See United States v. Monu*, 782

F.2d 1209, 1211 (4th Cir. 1986); *United States v. Hayes*, 775 F.2d 1279, 1282 (4th Cir. 1985).

The formulation of the essential elements of a Travel Act violation is not in dispute.

Defendants have raised challenges to the Government's interpretation of the statute that have a

bearing on what the Government must prove to establish these elements.

### B.  *Intent to Distribute Proceeds of Unlawful Activity*

Defendants argue that when a Travel Act charge is predicated on the violation of a state-law

gambling offense, the Government is required to allege in the indictment and ultimately prove that

Defendants knew that the gambling activity violated state gambling laws and that they intended to

violate the law.  The Government's response can be reduced to the maxim that ignorance of the law

is no defense.  Defendants' argument is unavailing.  It runs contrary to the clearly expressed intent

of Congress and to established Fourth Circuit precedent.

The Court begins as usual with the statutory text.  The language at issue is the phrase "with

intent to . . . distribute the proceeds of any unlawful activity."  18 U.S.C. § 1952(a)(1).  The Court

should give the words used in statutes their common meanings unless there is some indication that

Congress intended those words to carry a different meaning.  *Stephens*, 565 F.3d at 137; *see also*

*Morissette v. United States*, 342 U.S. 246, 263 (1952).  The inclusion of a definition for a word in

a statute is an unmistakable sign that Congress intended that word to have a specialized meaning.

*See Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2140 (2008).

"Unlawful activity" is a defined term.  Defendants' apparent attempt to attach some

significance to the word "unlawful" is unpersuasive.  Congress often includes definitions in statutes

that have only a passing resemblance to the words they define.  *See, e.g.*, 18 U.S.C. § 1532(19)

(defining the common word "take" in the Endangered Species Act as "harass, harm, pursue, hunt,

shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct").  The

meaning of "unlawful activity" for the purposes of the Travel Act is found not in the common

meaning of those words but in the term's definition.

As a practical matter, the definition can be inserted into the statute in place of "unlawful

activity" so that the statute reads, in pertinent part, "Whoever travels in interstate commerce or uses

the mail or any facility in interstate or foreign commerce, with intent to . . . distribute the proceeds

of. . . any business enterprise involving gambling . . . in violation of the laws of the State in which

they are committed" shall be guilty.  Much like RICO and VICAR, the phrase "in violation of the

laws of the State" "merely serves a definitional purpose in characterizing the proscribed conduct."

*United States v. Loucas*, 629 F.2d 989, 991 (4th Cir. 1980); *see also United States v. Teplin*, 775

F.2d 1261, 1265 (4th Cir. 1985) (noting that the gravamen of a Travel Act violation is the use of

channels of interstate commerce to facilitate activity that typically constitutes offenses against

states).  To be a proper Travel Act predicate, a state statute identified in a Travel Act charge must

apply to activity that can be described generically as gambling.  *Nardello*, 393 U.S. at 295-96.

Provided that the statute satisfies this criterion, it supplies the definition of gambling.  Thus, gambling for the purpose of a Travel Act offense is defined by the law of the state in which the activity occurred.  Reading the phrase "in violation of the laws of the State" in this manner accords with the common understanding of nearly identical language in VICAR and RICO.  Moreover, the phrase is not reduced to surplusage when interpreted in this manner.

In this case, the Government therefore must prove that the PMC enterprise's gambling activities violated the laws of the states in which they occurred.[29]  *See United States v. Brown*, 505 F.2d 261, 262–62 (4th Cir. 1974) (vacating Travel Act conviction where post-conviction change in interpretation of state law resulted in defendant's actions no longer being in violation of predicate state offense charged in indictment).  It is quite another matter, however, to require the Government to prove that Defendants were aware that the PMC's gambling activities were in violation of state laws.

"The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."  *Cheek v. United States*, 498 U.S. 192, 199 (1991); *see also Barlow v. United States*, 32 U.S. (7 Pet.) 404, 411 (1833) ("It is a common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.").  Exceptions to this rule should be recognized only where a statute's language clearly evidences a legislative intent that criminal liability is to be predicated only upon the violation of a

---

[29]  To be clear, the Government need not prove a violation of state law in every instance to establish a Travel Act violation.  *See Loucas*, 629 F.2d at 991–92.  For instance, charges under § 1952(a)(3) apply to persons who travel in interstate commerce with the intent to "establish" unlawful activity. This presupposes that unlawful activity has yet to occur.  In contrast, charges under § 1952(a)(1), like those here, apply to those who travel with the intent to distribute the proceeds of the proscribed unlawful activity, in this case a business enterprise involving gambling.  Gambling obviously must have taken place before it can generate any proceeds.

known legal duty.  *See United States v. Blair*, 54 F.3d 639, 643 (7th Cir. 1995).  For example, criminal penalties for violations of highly technical statutes applying to *malum prohibitum* conduct, such as those in some of the more arcane provisions of the Internal Revenue Code, typically require proof of a "willful" violation of the statute.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007).  Willful is a term of art employed by Congress to denote that the statute is violated only if the accused "acted with knowledge that his conduct was unlawful."  *Id*. (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)); *see also Screws v. United States*, 325 U.S. 91, 101 (1945).

In contrast, the Travel Act applies to persons who travel "with intent" to distribute proceeds of an unlawful activity.  18 U.S.C. § 1952(a).  "With intent," and its more common cousin, "intentionally," are not synonymous with "willful."  Intentionally refers to the intent to act, not the intent to violate a known legal duty.  "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent."  *Ellis v. United States*, 206 U.S. 246, 257 (1907) (interpreting criminal statute applying to persons "who shall intentionally violate any provision of this act"); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 176 L. Ed. 2d 519, 530 (2010) ("[I]n the criminal context, . . . reference to a 'knowing' or 'intentional' 'violation' or cognate terms has not necessarily implied a defense for legal errors.").  Accordingly, the Court finds no statutory support for Defendants' argument that the Travel Act requires proof that they intentionally violated a known legal duty.

For good measure, it should further be noted that Defendants' argument is foreclosed by Fourth Circuit precedent.  In *United States v. Hawthorne*, the Fourth Circuit stated:

> We do not think the statute (18 U.S.C.A. § 1952) requires proof that the defendant knew that he was violating the Indiana law by operating slot machines in the state,

> although there was evidence from which the jury could have so found. Such
> knowledge was not required to convict under the Indiana statute . . ., and we
> think it sufficient under section 1952 that the defendant knowingly caused to be
> transmitted interstate by the Western Union money order proceeds of a gambling
> enterprise which was unlawful under the Indiana statute.

356 F.2d 740, 742 (1966) (citations omitted); *cf. United States v. Salsbury*, 430 F.2d 1045, 1048 n.2

& 1051 (4th Cir. 1980) (approving jury instructions that did not instruct jury that defendant intended

to violate state law or that he knew his gambling actions violated state law); *United States v.

Wechsler*, 392 F.2d 344, 347 n.3 (4th Cir. 1971) (citing *Hawthorne*'s mens rea standard with

approval). Although *Hawthorne* is of a fairly ancient vintage, its import is unequivocal.[30] Barring

more recent binding authority to the contrary, *Hawthorne* is controlling.

      *Hawthorne* has not been expressly overruled or questioned by the Fourth Circuit.

Nonetheless, Defendants contend that it is no longer good law. They cite two more recent Fourth

Circuit decisions in support of this contention, *United States v. Polowichak*, 783 F.2d 410 (4th Cir.

1986), and *United States v. Gallo*, 782 F.2d 1191 (4th Cir. 1986). These cases do not cast doubts

on the continuing validity of *Hawthorne*.

      In *Polowichak*, the defendants were charged with interstate travel to promote a business

enterprise involving marijuana in violation of 18 U.S.C. § 1952(a)(3). The defendants were truck

drivers who delivered three truckloads of marijuana across state lines. The court noted that "travel

in interstate commerce with the specific intent to promote a business enterprise involving marijuana

---

[30] The holding in *Hawthorne* is on one side of a circuit split. *Compare Hawthorne*, 356 F.2d at 742
(holding that a defendant need not know that state law was violated), *and United States v. Welch,*
327 F.3d 1081, 1096 n.15 (10th Cir. 2003) (same), *with* United States v. Perrin, 580 F.2d 730, 737
(5th Cir. 1978) (holding that accused must intend to violate a state law), *United States v. Stagman*,
446 F.2d 489, 491–92 (6th Cir. 1971) (same), *and United States v. Polizzi*, 500 F.2d 856, 876–77
(9th Cir. 1974) (holding that accused must know that state law was violated, but need not have the
intent to violate state law himself).

constitutes an essential element of a violation of § 1952(a) (3)." *Polowichak*, 783 F.2d at 415.  The loads of marijuana in the trucks were hidden behind a "shield of paper products." *Id.*  The factual issue, therefore, was whether the defendants knew they were delivering marijuana to promote a marijuana business enterprise, rather than delivering innocuous paper products.  As Defendants highlight, the Fourth Circuit reversed the district court for failing to instruct the jury on the specific intent element of the Travel Act offense.  However, the Fourth Circuit did not, as Defendants suggest, hold that specific intent meant an intent to violate a known legal duty.  Rather, the court noted that the jury should have been instructed that the defendants had to have the specific intent to promote a business enterprise involving marijuana, observing that "the major proof of such a specific intent would be evidence that [the defendants] had knowledge of the load they were carrying." *Id.*; *see also id.* at 417 ("We recognize . . . that counsel for both the defense and the prosecution in final arguments to the jury directed the jury's attention to whether the truck drivers knew what they were transporting.  But the law is clear that the arguments of counsel cannot substitute for instructions by the court.").

Having a specific intent to promote a drug or gambling business enterprise is distinguishable from having an intent to violate a state law.  Defendants' attempt to distinguish *Polowichak* from the instant case by noting that marijuana is inherently illegal, whereas gambling is not, does not change the fact that neither the Fourth Circuit nor the Travel Act expressly state that knowledge of illegality is necessary for a Travel Act conviction.  Moreover, when the Travel Act was enacted in 1964, almost all forms of gambling were illegal in most states.  *See* National

70

Gambling Impact Study Commission Final Report 1-1, 2-1 (1999)[31] (discussing history of legalized gambling); Richard Shawn Oliphant, Note, *Prohibiting Casinos from Advertising: The Irrational Application of 18 U.S.C. § 1304*, 38 Ariz. L. Rev. 1373, 1377−80 (1996) (same).  The lesson from *Polowichak* to be applied to this case is that Defendants had to have known that they were transporting the proceeds of gambling, as opposed to, for example, PMC membership dues.  The requisite mens rea thus is the intent to distribute proceeds of the gambling enterprise.[32]

The second case cited by Defendants, *Gallo*, likewise does not support their position.  In *Gallo*, the defendant was granted a new trial because the district court failed to instruct on the definition of "unlawful activity."  The *Gallo* court noted, "One element of a Travel Act violation is proof of specific intent to promote 'unlawful activity', defined for relevant purposes, as any illegal business enterprise involving narcotics or controlled substances."  *Gallo*, 782 F.2d at 1194.  The jury could not have found that the defendant had a specific intent to promote "unlawful activity" within the meaning of the Travel Act if it was not instructed on the statutory definition of the term "unlawful activity."  *See id*. at 1195.  Absent from the court's discussion in *Gallo* is any suggestion that the accused must be aware that a state law was violated and that he intended to so violate the law.  Again, the intent to promote, or distribute the proceeds of, a business enterprise involving drugs or gambling is conceptually distinguishable from an intent to violate a state law.

Although Defendants' argument fails on legal grounds, their situation is not unsympathetic under the facts of this case.  Defendants highlight that they are facing federal felony charges for

---

[31]  *Available at* http://govinfo.library.unt.edu/ngisc/reports/fullrpt.html.

[32]  The distribution of gambling proceeds need not have been the sole reason for the interstate travel.  *See United States v. Peskin*, 527 F.2d 71, 75 (7th Cir. 1975); *United States v. Billups*, 522 F. Supp. 935, 945 (E.D. Va. 1981).

delivering the proceeds of an activity, running a raffle, that is misdemeanor conduct under state law. This protestation is of no legal moment, *United States v. Garramone*, 380 F. Supp. 590, 593 (E.D. Pa. 1974), but it goes to the fundamental fairness of the charging decision.  Moreover, raffles are conducted routinely by civic groups, schools, and charities.  It is likely that those raffles typically violate state gambling laws, even if the otherwise upstanding groups holding the raffles would be surprised to learn so.  In the same manner, it appears that at least some Defendants charged in the Travel Act counts may well have had no notion they were engaging in anything but lawful conduct in conducting the raffles or transporting the proceeds.  For many Defendants charged in this case, this problem has been mitigated and ultimately remedied by dismissal from this case following a plea to a misdemeanor in state court.

The facts of this case present a scenario that Congress may well have not envisioned when it enacted the Travel Act.  But this, again, is of no legal consequence.  What matters is whether or not Defendants' actions fall within the ambit of the statute as drafted by Congress and interpreted by courts superior to this one.  If the result seems unfair but is not unconstitutional, this Court has no discretion in the matter.  *United States v. Noland*, 517 U.S. 535, 541 n.3 (1996) ("[The defendant] may or may not have a valid policy argument, but it is up to Congress, not this Court, to revise the determination if it so chooses."); *Chung Fook v. White*, 264 U.S. 443, 446 (1924) ("The words of the statute being clear, if it unjustly discriminates . . ., or is cruel and inhuman in its results, as forcefully contended, the remedy lies with Congress and not with the courts.").

### C.  Business Enterprise Involving Gambling

To prove a Travel Act violation, the Government must establish the existence of a "business enterprise involving gambling."  18 U.S.C. § 1952(b)(1).  Congress left the task to the judiciary to

give meaning to the term "business enterprise."  The term is not problematic in the mine-run case, but arguably this is not such a case.  Defendants have at times challenged the Government's assertion that the PMC was a business enterprise involving gambling. The term warrants some discussion.

The commonly accepted formulation of a business enterprise is that it requires evidence of "a continuous course of conduct."  *United States v. Corbin*, 662 F.2d 1066, 1072 (4th Cir. 1981); *accord United States v. Brown*, 956 F.2d 782, 786 (8th Cir. 1992); *United States v. Rinke*, 778 F.2d 581, 586 (10th Cir. 1985); *United States v. Donaway*, 447 F.2d 940, 944 (9th Cir. 1971).  This definition is contrasted with evidence of only "an isolated, sporadic transaction," which does not make for a business enterprise.  *Gallo*, 782 F.2d at 1194.  These descriptions are derived from the legislative history of the Travel Act, which gives no further insight into the meaning Congress attributed to the term than these general descriptions.  *See United States v. Roselli*, 432 F.2d 879, 884–88 (9th Cir. 1970) (reviewing legislative history of Travel Act).  It is well-established that evidence of a single incident of criminal conduct, without more, is not sufficient to demonstrate a business enterprise.[33]  *See Corbin*, 662 F.2d at 1072–73 (finding that possession of 4,700 Quaalude tablets did not establish a continuous course of conduct where there was no evidence that defendants had distributed narcotics in the past or planned to continue to do so in the future).  However, the point at which isolated, sporadic conduct becomes a continuous course of conduct is not well defined.  *See, e.g.*, *United States v. Lignarolo*, 770 F.2d 971, 979 (11th Cir. 1985) (approving jury

---

[33]  Although a single incident may not establish proof of a business enterprise, a single incident of interstate travel is all that is necessary to prove the offense if it is in connection with an otherwise established business enterprise.  *See United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981) (citing *United States v. Teemer*, 214 F. Supp. 952, 958 (N.D. W. Va. 1963)).

charge, despite the defendant's request for more guidance, instructing that "what must be proved beyond a reasonable doubt is that the enterprise engaged in a continuous course of conduct or series of transactions other than casual or sporadic or isolated activity").

Although the threshold standard has not been articulated clearly, in practice courts have been consistent in finding the existence of business enterprises without evidence of extensive or protracted criminal conduct. *See United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981) ("Neither evidence of large-scale operations nor long-term duration is required to support a Travel Act conviction."); *see also United States v. Smith*, 704 F.2d 723, 728 (4th Cir. 1983) (holding that a § 1952 "business enterprise" need not be as extensive an operation as an "illegal gambling business" under § 1955. It has been held to be sufficient evidence of a continuous course of conduct where the Government has established that the defendants "had a history" of engaging in similar conduct. *United States v. Breeden*, 149 F. App'x 197, 200 (4th Cir. 2005) (unpublished); *see also United States v. Carrion*, 809 F.2d 1120, 1127 (5th Cir. 1987) (evidence of three sales of cocaine plus evidence "tending to show" distribution in the past sufficient); *United States v. Davis*, 666 F.2d 195, 202 (5th Cir. 1982) (evidence of one drug transaction accompanied with evidence "as a whole showed that [the defendants'] had for some time engaged in" drug trafficking sufficient). Plans to continue the proscribed conduct in the future also may demonstrate a continuous course of conduct. *See United States v. Davis*, 780 F.2d 838, 842 (10th Cir. 1985); *United States v. Cozzetti*, 441 F.2d 344, 348 (9th Cir. 1971); *United States v. Bergdoll*, 412 F. Supp. 1308, 1315 (D. Del. 1976) (citing *Spinelli v. United States*, 382 F.2d 871, 889–90 (8th Cir. 1967)). Perhaps the low-water mark for evidence sufficient to demonstrate a continuous course of conduct comes from *United States v. Monu*, 782 F.2d 1209 (4th Cir. 1986). In *Monu*, the defendant was caught with a

triple beam balance scale, a common tool in the drug distribution trade. The Fourth Circuit concluded that "[t]his tool indicates that [the defendant's] receipt of the heroin was part of an ongoing enterprise, rather than an isolated instance of criminal conduct." *Id*. at 1211.

The pattern that emerges from these cases is that a "continuous course of conduct" requires some minimal evidence of temporal continuity. This may consist of evidence that the underlying activity occurred in the past, will occur in the future, or would have occurred in the future but for the intervention of law enforcement. Provided that there is more than one incident of prohibited conduct, there is no minimum threshold for how extensive or long-lasting criminal conduct must be to be deemed a business enterprise. Nor, incidentally, is there a minimum amount of profit that must be gained or potentially could be gained by the purported business enterprise. *Cf. Smith*, 704 F.2d at 727 (contrasting § 1952 with § 1955); *Corbin*, 662 F.2d at 1072 (noting that among various authorities only one mentioned a requirement of a profit-seeking motive for the enterprise). Accordingly, with this guidance, limited as it is, the determination of whether the PMC was a business enterprise involving gambling will be committed to the trier of fact.

## VII. WITNESS RETALIATION

Count Four charges certain Defendants with conspiring to retaliate against a witness in violation of 18 U.S.C. § 1513(f) and § 1513(b)(2). The factual basis for this charge is substantially the same as Count Five, which was discussed previously. Defendants Cremeans, Bumgarner, Geer, Michael Stevens, and Richard Stevens are all implicated in Count Four.

Section 1513(b)(2) provides, in relevant part, "Whoever knowingly engages in any conduct and thereby causes bodily injury to another person . . . , with intent to retaliate against any person for . . . any information relating to the commission or possible commission of a Federal offense . .

. given by a person to a law enforcement officer" shall be guilty of the offense.  The witness retaliation statute contains its own conspiracy provision, which states: "Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."  18 U.S.C. § 1513(f).  "Law enforcement officer" is defined in part as "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant."  18 U.S.C. § 1515(a)(4).

Authority for interpreting § 1513 is scarce, especially with regard to the conspiracy provision which was added to the statute in 2002, 21st Century Department of Justice Appropriations Authorization Act, Pub L. No. 107-273, § 3001(b), 116 Stat. 1748, 1804 (2002).  This has, unsurprisingly, led to some uncertainty as to the essential elements of the offense.  A plain reading of the statute leads to a few initial conclusions.  First, a person (usually, but not necessarily, the intended victim) had to actually give information regarding a federal offense to a law enforcement officer.[34]  *See* 18 U.S.C. § 1513(b)(2) (applying to retaliation for "information . . . given by a person to a law enforcement officer").  Second, the definition of law enforcement officer in § 1515(a)(4) indicates that the person to whom the information was divulged had to be a federal agent or a person working on behalf of the federal government in some capacity.  *See United States v. Cross*, 258 F. Supp. 2d 432, 435 (E.D. Va. 2003) (holding that an officer of a city police force assigned to a DEA Task Force was a law enforcement officer within the meaning of § 1515(a)(4)).

---

[34]   The phrase "commission or possible commission of a Federal offense" has been interpreted by the Fourth Circuit, in the context of 18 U.S.C. § 1512, which contains nearly identical language, as referring to conduct which would constitute a violation of federal law if charged, regardless of whether it is ever charged or even investigated by federal authorities.  *United States v. Harris*, 498 F.3d 278, 286 (4th Cir. 2007).

There is no authoritative discussion of the elements of a § 1513(b)(2) offense in this circuit. A recent Second Circuit case penned by now-Justice Sotomayor interpreted the elements of § 1513(b)(2) as:

> One, the defendant engaged in conduct that caused or threatened a witness with bodily injury; two, the defendant acted knowingly, with the specific intent to retaliate against the witness for information the witness divulged to law enforcement authorities about a federal offense; and three, the officials to which the witness divulged information were federal agents.

*United States v. Draper*, 553 F.3d 174, 180 (2d Cir. 2009).  This formulation of the elements closely tracks the statutory language and is not inconsistent with the Fourth Circuit's formulation of the elements with respect to § 1513(b)(1).  *See United States v. Cofield*, 11 F.3d 413, 419 (4th Cir. 1993).[35]  The Court finds *Draper*'s formulation of the elements to be persuasive.  They will be employed with respect to Count Four.

Several issues must be clarified with respect to the intent element.  First, the motive of retaliation need not be the sole reason for the planned attack.  It need only have been a motivating factor.  *See United States v. Vega Molina*, 407 F.3d 511, 529‒30 (1st Cir. 2005); *see also United States v. Houlihan*, 937 F. Supp. 75, 76 (D. Mass. 1996).  Second, there is no indication from the statute that Congress intended to incorporate a temporal relationship between the communication with federal agents and the retaliation.  So long as retaliation is a motivating factor, it is immaterial

---

[35] As stated in *Cofield*:

> The elements of an offense under 18 U.S.C. § 1513 are (1) knowing engagement in conduct (2) either causing, or threatening to cause, bodily injury to another person (3) with the intent to retaliate for, inter alia, the attendance or testimony of a witness at an official proceeding.

11 F.3d at 419.

that the communication may have occurred at some distant time in the past.  Third, there is an outstanding question as to whether the Government must prove that Defendants knew that the intended victim had communicated with federal agents.  This question is presented by a recent case from the Eastern District of Kentucky, *United States v. Denham*, 663 F. Supp. 2d 561 (E.D. Ky. 2009).  The *Denham* court engaged in a thorough and scholarly analysis of the text and legislative history § 1513(b)(2).  That court concluded that the "specific intent element of a § 1513(b)(2) offense requires the Government to prove that a defendant knew of the involvement of a *federal* officer." *Id.*at 574 (emphasis added).  In *Denham*, the court rejected a defendant's plea because the defendant stated during the plea colloquy that she thought the investigation was wholly a state matter, even though it was, in fact, federal.  The court distinguished between the actual involvement of a federal agent, which is necessary for jurisdictional purposes, and the defendant's knowledge of federal involvement, which the court found to be necessary to prove the intent element.  *Id.* at 565-66.  This Court need not decide whether to follow *Denham*'s lead at this time because the Government has elected to err on the side of caution.[36]  It has represented that intends to prove that Defendants were aware of the involvement of federal authorities.

Having settled upon the elements of a substantive witness retaliation offense, the Court must now address the conspiracy provision.  Section 1513(f) contains no express requirement that the

---

[36]  In a recent opinion, the Fourth Circuit applied *Denham*'s holding, but only for the sake of argument, when reviewing the sufficiency of the evidence for a defendant's conviction under 18 U.S.C. § 1513.  *See United States v. Ashley*, ___ F.3d ___, 2010 WL 2169079, at *7 n.1, 2010 U.S. App. LEXIS 11025, at *6 n.1 (4th Cir. June 1, 2010) ("We shall assume for purposes of argument that [the defendant] is correct that Section 1513 requires that a defendant know that the officer with whom an informant is communicating is a federal one.") (citing *Denham*, 663 F. Supp. 2d at 566-71).  The Fourth Circuit's citation to *Denham* in this fashion goes to show how unsettled the law is on this issue.

Government allege or prove an overt act in furtherance of the conspiracy.  18 U.S.C. § 1513(f) ("Whoever conspires to commit any offense under this section shall be [guilty].").  It is like RICO's conspiracy provision in this respect and subject to the same analysis.  *See supra* Part IV.  The general understanding of a criminal conspiracy is an agreement to accomplish some criminal purpose.  *Cf. Salinas*, 522 U.S. at 65; *Pryba*, 900 F.2d at 760.  Accordingly, the Court finds that § 1513(f) does not require proof of an overt act in furtherance of the conspiracy.

The Court finds that the Government must prove the following elements to secure a conviction under Count Four: (1) there was an agreement with one or other more persons, tacit or expressed, to undertake to violate 18 U.S.C. § 1513(b)(2); (2) the accused willfully joined the conspiracy; and (3) the accused's intent was to accomplish the criminal purpose of the conspiracy. To establish the object of the conspiracy element, the Government must further prove that the agreement, if carried out, would entail (1) that a person would engage in conduct that causes any person bodily injury or threatens any person with bodily injury; (2) that this conduct would be performed knowingly, with the specific intent to retaliate against a witness for information the witness divulged to law enforcement authorities about a federal offense; and (3) that the official to whom the witness divulged the information was a federal agent or otherwise working on behalf of the federal government in some capacity.

## VIII.  OBSTRUCTION OF JUSTICE- WITNESS TAMPERING

Count Thirteen charges several Defendants with obstruction of justice in violation of 18 U.S.C. § 1512(a)(2)(C), § 1512(a)(3)(B)(ii), or with aiding and abetting obstruction in violation of 18 U.S.C. § 2.  The factual basis for this offense has been discussed previously with respect to Count Fourteen.  In short, it concerns the alleged beating of a suspected informant in a Hammonton, New

Jersey, hotel room.  The remaining Defendants facing charges on this count are Defendants Elmer Moore, Wolfe, Demarco, and Claypool.

The substantive offense charged here, § 1512(a)(2)(C), provides in pertinent part: "Whoever uses physical force or the threat of physical force against any person . . .with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense" is guilty of the offense.  The elements of this offense, which are not in dispute, are as follows: (1) the accused used or threatened the use of physical force against any person; and (2) the accused did so with the intent to hinder, delay, or prevent the communication of information relating to a federal offense to a law enforcement officer.  *Cf. Harris*, 498 F.3d at 284 n.4 (4th Cir. 2007) (noting that § 1512(b)(3) and § 1512(a)(2)(C) share an identical mens rea element); *United States v. Perry*, 335 F.3d 316, 320‒21 (4th Cir. 2003) (setting forth elements of § 1512(b)(3)).

No significant disputes have arisen in this case thus far as to the construction of the charge in Count Thirteen.  The Court makes the following brief points for the benefit of counsel, however.  Section 1512(a) is concerned with protecting both existing and potential federal investigations.  *Harris*, 498 F.3d at 286.  Thus, it embraces information about conduct that would be a federal offense if charged as such even though it may not be the subject of a federal criminal investigation.  *Id*. (discussing attempt to suppress information about repeated drug trafficking activity that had previously been communicated only to local law enforcement authorities).  A defendant charged under this section need not possess the legal sophistication to know that the conduct is potentially a federal, rather than state, offense.  *See Perry*, 335 F.3d at 321‒22.  Nor must a defendant have "contemplated any particular officer, federal or otherwise, with whom his victim might

communicate." *Harris*, 498 F.3d. at 287 (citing 18 U.S.C. § 1512(g)(2)).  Similarly, the victim need

not have "actually contemplated going to law enforcement" with the information.  *Diaz*, 176 F.3d

at 90; *see also Harris*, 498 F.3d at 286.  It is sufficient that the defendant used or threatened to use

physical force with the intent to prevent the communication of information about conduct

constituting a federal offense to any law enforcement authority.

## IX.  *OBSTRUCTION OF JUSTICE- DESTRUCTION OF EVIDENCE*

Count Sixteen charges Defendants Weaver, Hinkle, and Floyd Moore with destruction of

evidence in violation of 18 U.S.C. § 1512(c)(1), or with aiding and abetting such destruction in

violation of 18 U.S.C. § 2.  Few factual details about this charge are to be found on the record.

Section 1512(c)(1) states, in relevant part, "Whoever corruptly . . . alters, destroys, mutilates,

or conceals a record, document, or other object . . . with the intent to impair the object's integrity

or availability for use in an official proceeding" shall be guilty of the offense.  The elements of a §

1512(c)(1) violation are (1) that the accused corruptly altered, destroyed, mutilated, or concealed

a record, document, or object; and (2) that the accused did so with the specific intent to make the

object impaired or unavailable for use in an official proceeding.  *See United States v. Ortiz*, 367 F.

Supp. 2d 536, 543 (S.D.N.Y. 2005); *see also United States v. Johnson*, 553 F. Supp. 2d 582, 626

(E.D. Va. 2008).

This offense, like the previous, has thus far not been responsible for conflict between the

parties.  The only expressed disagreement is whether the Government must prove that Defendants

knew that their conduct was in violation of the law.  The Court therefore will clarify this and another

key point.  First, the term "official proceeding" refers, for present purposes, to any "proceeding

before a judge or court of the United States."  18 U.S.C. § 1515(a)(1)(A).  However, the proceeding

need not have been yet instituted at the time of the offense conduct.  18 U.S.C. § 1512(f).  If a proceeding has been instituted, the defendant need not know that it is a federal proceeding.  18 U.S.C. § 1512(g)(1).

Second, "corruptly" means to act with the purpose of wrongfully impeding the administration of justice.  *See United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007); *Johnson*, 553 F. Supp. 2d at 626; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) ("'Corrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil."); *Martin v. United States*, 166 F.2d 76, 79 (4th Cir. 1948) ("'[C]orruptly' means for an improper motive.").  There must be a nexus "in time, causation, or logic" between the offense conduct and the official proceeding such that the "natural and probable effect" of the conduct would be to interfere with the pending or foreseeable proceeding.  *Johnson*, 553 F. Supp. 2d at 626 (adopting test from *United States v. Aguilar*, 515 U.S. 593, 599 (1995), which pertained to similar language in 18 U.S.C. § 1503); *accord United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009); *United States v. Reich*, 479 F.3d 179, 185–86 (2d Cir. 2007); *Matthews*, 505 F.3d at 708.  It is sufficient that it was reasonably foreseeable to the accused that his conduct would hinder a proceeding.  *See United States v. Neiswender,* 590 F.2d 1269, 1273 (4th Cir. 1979) (construing similar language in § 1503).

Defendants would add an additional requirement to the Government's burden of proving that a defendant acted "corruptly," namely that as it is used in § 1512(c)(1) it means that the accused specifically intended to violate a known legal duty.  Defendants cite no authority in support of this contention.  This Court's research has uncovered only one case that offers support to Defendant's position.  In *United States v. Fumo*, an unpublished decision from the Eastern District of Pennsylvania, the court defined "corruptly" as "to act *purposefully* to violate a legal duty, to

82

accomplish an unlawful end or unlawful result, or to accomplish some otherwise lawful end or lawful result in an unlawful manner." Cr. No. 06-319, 2009 WL 1688482, at * 54, 2009 U.S. Dist. LEXIS 51581, at *173–74 (June 17, 2009) (emphasis in original). The *Fumo* court relied on, and arguably extended, the holding in *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). *Arthur Andersen* construed the mens rea element of part of § 1512(b). One of the ways that the section can be violated is by a defendant who "knowingly . . . corruptly persuades" another to engage in certain obstructive activities. 18 U.S.C. § 1512(b). The Supreme Court found that "knowingly" modified "corruptly," and concluded, "Only persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuade.'" *Arthur Andersen*, 544 U.S. at 706. *Arthur Andersen* cautions that interpretations of the term "corruptly" in other obstruction statutes are not directly applicable to § 1512(b) because those statutes do not include the modifier "knowingly." *Id*. at 705 n.9. The converse is no less true. *Arthur Andersen*'s interpretation of "knowingly . . . corruptly" should not be superimposed on statutes that require only that the defendant act "corruptly." Furthermore, the Supreme Court stated in *Arthur Andersen* that a defendant charged under the portion of § 1512(b) at issue there must be "conscious of *wrongdoing*," *id*. at 706 (emphasis added), but it did not further state that "wrongdoing" means a violation of the law. Section 1512(c), like other obstruction statutes but unlike § 1512(b), does not contain the modifier "knowingly." Section 1512(c) therefore should not be subject to the *Arthur Andersen* standard. The Court is not persuaded by *Fumo* or Defendants' bare assertions that the term "corruptly" in § 1512(c) necessitates proof that Defendants' specifically intended to violate a known legal duty. *Cf. Blair*, 54 F.3d 643 (holding that courts should require proof that defendants violated a known legal duty only where Congress unambiguously incorporated such a requirement into the statute).

83

## X.  CONCLUSION

Counsel are hereby notified that the Court will evaluate proposed guilty pleas and jury instructions in accordance with the findings set forth herein.  With these issues resolved, the Court shall resume taking and considering guilty pleas and conducting sentencing hearings.  Any further legal disputes that should arise from this point forward shall be addressed as appropriate.

The Court will immediately undertake a review of the factual bases for the guilty pleas of the following Defendants: Bumgarner, Claypool, Cremeans, Floyd Moore, and Stover.   These Defendants' pleas will be analyzed first because the issues in Stover's case have particularly difficult and potentially wide-ranging implications, and the others are the only Defendants who remain in custody following pleas.  The Court reserves the review of the other Defendants who have entered pleas until the time of their sentencing hearings.  The Court will place the onus on counsel to raise these issues, if they so choose, at any time in advance of sentencing with regard to Defendants who have pled guilty but are on bond.

The Court **DIRECTS** the Clerk to send a copy of this Order to Defendants and counsel, and the United States Attorney.

ENTER:        June 3, 2010

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE