IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                               CRIMINAL ACTION NO. 2:09-cr-00222-01

DAVID KEITH BARBEITO,

        Defendant.

**MEMORANDUM OPINION**

The purpose of this Memorandum Opinion is to set forth the Court's findings regarding the factual bases for Defendant David Keith Barbeito's guilty pleas.

*I. BACKGROUND*

Defendant David Keith Barbeito is one of fifty-five members and associates of the Pagans Motorcycle Club (PMC) charged in a sweeping forty-four count indictment. A pared-down twenty-nine count superseding indictment was returned on February 2, 2010. Defendant is named in Counts One, Two, Seven, Eight, and Eleven of the superseding indictment. Defendant also is charged in a two-count indictment returned in the District of Maryland on May 27, 2010.

Defendant appeared before the Court on June 30, 2010, to enter guilty pleas to Counts Eight and Eleven of the superseding indictment pursuant to a plea agreement he had reached with the Government. Count Eight charged him with aiding and abetting the use of an interstate facility in aid of racketeering activity in violation of 18 U.S.C. § 1952(a)(1) and § 2. Count Eleven charged Defendant with aiding and abetting interstate travel in aid of racketeering in violation of the same

statutes. Defendant also entered guilty pleas to both counts of the two-count indictment from the District of Maryland (Maryland indictment), which was transferred to this district pursuant to Rule 20 of the Federal Rules of Criminal Procedure. Count One of the Maryland indictment charged Defendant with possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Count Two charged him with possessing an unregistered firearm in violation of 26 U.S.C. § 5845(a)(8) and § 5845(f)(2).

The Court accepted Defendant's guilty pleas but deferred adjudging him guilty until the time of sentencing. Defendant's plea to each count "constituted an admission of all material elements of the crime." *United States v. Nelson*, 484 F.3d 257, 261 (4th Cir. 2007). The Court found a factual basis only for Count One of the Maryland indictment at the hearing. The Court reserved finding a factual basis for the remaining counts pending further review of the record and the law. The Court hereby sets forth its findings for the record.

## II. DISCUSSION

*A. Counts Eight and Eleven of the Superseding Indictment*

Counts Eight and Eleven of the superseding indictment charge Defendant with aiding and abetting violations of 18 U.S.C. § 1952(a)(1),[1] which is commonly known as the Travel Act. Evidence supporting the factual bases for Defendant's pleas to these offenses consists of undisputed testimony, exhibits, and admissions from the June 30 hearing, and from stipulations of facts attached

---

[1] 18 U.S.C. § 1952(a)(1) provides, in pertinent part:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . distribute the proceeds of any unlawful activity . . . and thereafter performs or attempts to perform [the distribution of the proceeds of an unlawful activity] . . . shall be fined under this title, imprisoned not more than 5 years, or both . . . .

to the plea agreements of other defendants who have pled guilty to Travel Act violations in this case.[2]

These charges arose out of an annual motorcycle raffle conducted by the PMC. Five thousand tickets were sold each year for ten dollars apiece. The tickets offered the purchaser the purported chance to win a Harley Davidson motorcycle. Each ticket contained two four-digit numbers. The raffles were tied to a drawing of the Pennsylvania Daily Big 4 lottery on a specific date identified on the ticket. If one of the two numbers on the ticket matched the drawing on that day, then the purchaser would win the motorcycle. The raffles potentially generated $50,000 in gross proceeds for the PMC annually.

As national president of the PMC, Defendant authorized the annual raffles. The raffles were initiated each year when Defendant delivered the raffle tickets to members of the PMC's mother club, including the PMC's national vice president, Floyd Moore.[3] The members of the mother club were the PMC's national officers. Each mother club member oversaw a territorial region and all local chapters within that region. The mother club members distributed the tickets to local PMC chapter presidents in various states, who in turn distributed them among their chapters' members. PMC members generally were given several months to sell their allotment of tickets. The members gave the money from the purchase of the tickets to their chapter presidents. The presidents then

---

[2] The PMC's raffles are discussed in stipulations of facts signed by Defendants Floyd Moore, William Hankins, Joseph Schmidt, Martin Nuss, and Timothy Flood. Schmidt, Flood, and other defendants have been dismissed from this case in exchange for pleading guilty in the Circuit Court of Kanawha County, West Virginia, to aiding and abetting the promotion of a raffle in violation of W. Va. Code § 61-10-11.

[3] Moore is a defendant in this case. He pled guilty on December 18, 2009, to racketeering in violation 18 U.S.C. § 1962(c).

delivered the money to the mother club member responsible for their region.  For example, the chapter presidents in Philadelphia, Pennsylvania, and the states of New York, New Jersey, West Virginia, and Florida delivered their money to Moore in St. Albans, West Virginia.  Moore would then deliver the proceeds to Defendant in Maryland.

The disbursement of the proceeds was in Defendant's discretion.  There is uncontested evidence that some of the proceeds were given to incarcerated PMC members and that some of the money was used to fund PMC events and parties.  There also is evidence that in 2008, each member of the PMC's mother club was given $1000 from the proceeds.

In 2007, the raffle proceeds from one of the PMC's Florida chapters were mailed by Martin Nuss to James Ronald Howerton.  The proceeds, in the sum of $540, were sent from Daytona Beach, Florida, via a United States Postal Service money order.  The comment line of the money order read "PMC Tick $."  The evidence does not indicate where Howerton received the money order.  Howerton cashed the money order and delivered the cash to Moore in St. Albans, West Virginia.

The due date for the proceeds of the 2008 raffles coincided with a "mandatory" PMC event in West Virginia on or about April 26, 2008.  Chapter presidents from various states, including Pennsylvania, New Jersey, and Florida, traveled to West Virginia on that weekend and delivered the proceeds from their chapters' ticket sales to Moore.  The proceeds of the 2008 raffle from Moore's region, approximately $20,000, were seized by law enforcement prior to the drawing.  However, the raffle proceeds from other mother club members were delivered to Defendant in 2008.

The Government proffered evidence, which Defendant did not dispute, that the PMC did not hold a license or otherwise obtain legal authorization to conduct a raffle in any of the states in which raffles tickets were sold.

To establish a factual basis for Defendant's pleas, the record must show that Defendant aided or abetted a substantive violation of the Travel Act. The essential elements of a Travel Act violation are as follows: (1) travel in interstate or foreign commerce or the use of any facility in interstate or foreign commerce; (2) intent to distribute the proceeds of an unlawful activity, that is, a business enterprise involving gambling; and (3) the subsequent distribution or attempted distribution of the proceeds. *See United States v. Monu*, 782 F.2d 1209, 1211 (4th Cir. 1986); *United States v. Hayes*, 775 F.2d 1279, 1282 (4th Cir. 1985). There is sufficient evidence in the record to establish each of these elements.

### *1. Use of interstate facility and interstate travel*

For the purposes of establishing a factual basis for Count Eight, there must be proof that Defendant, or a person aided and abetted by Defendant, used a facility in interstate or foreign commerce to facilitate the gambling enterprise. There is sufficient evidence of the use of at least two such facilities—the mail, 18 U.S.C. § 1952(a); *Monu*, 782 F.2d at 1211, and banking services, *United States v. Salsbury*, 430 F.2d 1045, 1048 (4th Cir. 1970); *United States v. Wechsler*, 392 F.2d 344, 347 n.3 (4th Cir. 1968). The evidence shows that Nuss obtained a postal money order for his chapter's raffle ticket proceeds. This money order was then sent though the mail to Howerton. Howerton subsequently cashed the money order. The record does not reflect the manner in which the money order was cashed, but postal money orders can be cashed only at a bank or federal post office. *See* U.S. Postal Serv., Domestic Mail Manual 503 § 14.3.2 (Aug. 2010).

Count Eleven requires proof of interstate travel. The PMC chapter presidents within Moore's region traveled from various states, including Pennsylvania, New Jersey, and Florida, with

the proceeds of their respective chapters' raffle ticket sales in 2008. The proceeds were then delivered by the chapter presidents to Moore in St. Albans, West Virginia.

### *2. Intent to deliver proceeds of unlawful activity*

The second element of the Travel Act has proven to be problematic for the defendants who have entered guilty pleas to offenses arising from the PMC raffles. To establish this element for Counts Eight and Eleven, there must be proof that the interstate travel or use of a facility in interstate commerce was with the intent to distribute the proceeds of an unlawful activity. Unlawful activity is defined, for present purposes, as "any business enterprise involving gambling . . . in violation of the laws of the State in which they occurred." 18 U.S.C. § 1952(b). To be deemed a business enterprise involving gambling, the enterprise's gambling activities must constitute "a continuous course of conduct." *United States v. Corbin*, 662 F.2d 1066, 1072 (4th Cir. 1981); *see also United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981). Finding a continuous course of conduct requires some minimal evidence of temporal continuity. This may consist of evidence that the underlying activity occurred in the past, will occur in the future, or would have occurred in the future but for the intervention of law enforcement. In contrast, evidence that the gambling activity was merely "an isolated, sporadic transaction" would not justify a finding that the enterprise was a business enterprise involving gambling. *United States v. Gallo*, 782 F.2d 1194 (4th Cir. 1986). The enterprise's proceeds must have been derived from an activity, in this case gambling, that was in violation of the laws of the state in which the activity occurred. However, as the Court previously found, the Travel Act does not require proof that a defendant was aware that the proceeds were produced in violation of a state law or that a defendant acted with a specific intent to violate a

known legal duty. *See United States v. Barbeito*, 2:09-cr-222, 2010 WL 2243878, at *36, 2010 U.S. Dist. LEXIS 55688, at *121 (S.D. W. Va. June 3, 2010).

The record is adequate to conclude that the PMC was a business enterprise involving gambling during the relevant time period. The PMC engaged in a continuous course of conduct of gambling activity that was in violation of the laws of some, if not all, of the states in which it operated. The superseding indictment alleges that the 2007 raffle violated the laws of Maryland, Florida, and West Virginia. In addition to those states, the 2008 raffle also allegedly violated the laws of Pennsylvania and New Jersey. The evidence need only establish that the enterprise's gambling activity violated the laws of any one state in which it operated, however. *See* 18 U.S.C. § 1952(b) (defining "unlawful activity" as "any business enterprise involving gambling . . . in violation of the laws of the State in which [the activity is] committed.").[4] The Government's undisputed proffer asserted that the raffles were conducted in generally the same manner each year. Thus, for the purpose of finding a continuous course of conduct, it appears that the previous years' raffles were conducted like those in 2007 and 2008.

It is a violation of Maryland law to possess any money received from the sale of a "lottery device." Md. Code Ann. Crim. Law § 12-205(b)(2). A lottery device is, among other things, any certificate that purports to entitle the purchaser to receive money or property if a contingency occurs. Md. Code Ann. Crim. Law § 12-201. Maryland also requires that organizations such as the PMC obtain a permit prior to conducting any gaming event. Md. Code Ann. Crim. Law §§ 13-1304, 13-1307. Defendant organized and conducted the PMC raffles from Maryland. The record evidences

---

[4] In this case, the activity was committed in multiple jurisdictions, and the laws of each jurisdiction may be used to establish the requisite unlawful gambling enterprise under the Travel Act.

that the PMC never obtained a permit or license to conduct a gaming event in Maryland. The record further indicates that Defendant received the money from the sale of raffle tickets from Moore, and presumably others, in 2007, and from mother club members other than Moore in 2008. It has therefore been established that the PMC's 2007 and 2008 raffles violated the laws of Maryland.

West Virginia law prohibits the "buying, selling or transferring of tickets or chances in a lottery." W. Va. Code § 61-10-10. State law further makes it an offense for a person to "set up or promote or be concerned in managing or drawing a lottery or raffle, for money or other thing of value" or to "have in his possession for the purpose of sale, or with intent to . . . transfer . . . a chance or ticket . . . in a lottery." W. Va. Code § 61-10-11.[5] Notably, West Virginia permits a "charitable or public service organization" to obtain licenses to conduct raffles. W. Va. Code § 47-21-4. Such organizations may conduct raffles without a license if the prize is worth less than $4000, the proceeds do not exceed $15,000 during any year, and certain record-keeping and accounting requirements are met. W. Va. Code § 47-21-3.

The evidence reflects that in 2007 and 2008, and presumably for the previous years' raffles, Defendant transferred the raffle tickets earmarked for chapters in Moore's territory to Moore in West Virginia. Moore's possession and subsequent transfer of the tickets to the chapters under his control was in violation of W. Va. Code § 61-10-10 and § 61-10-11. Moore's promotion and management of the raffle for the chapters within his territory also violated § 61-10-11. Thus, the record reflects that the PMC's raffles violated West Virginia's gambling laws.

---

[5] The Supreme Court of West Virginia has interpreted the words "lottery" and "raffle" as used in W. Va. Code §§ 61-10-10 and 61-10-11 as synonymous. *State v. Hudson*, 37 S.E.2d 553, 559 (W. Va. 1946) ("There is no substantial distinction between a lottery and a raffle, and . . . the words lottery and raffle [as used in the Code] should be and they are here considered as synonymous.").

The PMC's raffles were not isolated or sporadic incidents. They were conducted annually. The presentence report, which admittedly is not yet a part of the record, indicates that the raffles have been conducted at least since 2005. (¶ 41.) The raffles spanned a substantial portion of each year, as PMC members generally had several months in which to sell their allotment of tickets. The evidence indicates that the raffle tickets were being sold in at least four states. The potential gross proceeds, $50,000 per year, were substantial. The raffles extended several years into the past and likely would have continued indefinitely into the future had it not been for the intervention of law enforcement. This evidence establishes that the gambling activity was part of a continuous course of conduct.

Given that the PMC's raffles violated the gambling laws of at least two states and were part of a continuous course of conduct, the Court finds that the PMC raffle was a business enterprise involving gambling for the purposes of the Travel Act.

It further must be established that a person aided and abetted by Defendant used a facility in interstate commerce for the 2007 raffle and traveled in interstate commerce for the 2008 raffle with the intent to distribute unlawful gambling proceeds. For the 2007 raffle, which is the subject of Count Eight, the evidence proffered by the Government is that Nuss obtained and mailed a postal money order from Florida with the proceeds of his chapter's raffle ticket sales.[6] To establish the second element, the money order must have contained the proceeds of gambling in violation of the laws of the state in which it occurred, namely Florida. Like many states, Florida has comprehensive laws banning lotteries. Lotteries are defined as "any gambling scheme which contains elements of

---

[6] Howerton used a facility in interstate commerce when he cashed the money order. The superseding indictment alleges that this occurred in South Carolina, but there is no evidence of this in the record.

9

(1) prize, (2) chance, (3) consideration." *Blackburn v. Ippolito*, 156 So. 2d 550, 551 (Fl. Dist. Ct. App. 1963). Unless otherwise authorized by law, it is an offense in Florida to "[s]et up, promote, or conduct any lottery for money or for anything of value," to aid or assist the same, or to sell or possess a lottery ticket. Fla. Stat. Ann. § 849.09(1). Florida excepts certain organizations from the prohibition on lotteries provided that specified registration and reporting practices are observed. Fla. Stat. Ann. § 849.0935. The Government proffered that the PMC was not properly registered to conduct a lottery in Florida. The promotion and sale of raffle tickets by PMC members in Florida therefore violated the state's lottery statute. The proceeds of the sale were mailed via a postal money order to Howerton with the intent that the money would then be delivered to Moore in West Virginia, and ultimately to Defendant in Maryland. Accordingly, the second element of a Travel Act offense is satisfied as to Count Eight.

For Count Eleven, there must be evidence that a person traveled in interstate commerce with intent to distribute proceeds of the PMC gambling enterprise. The Government proffered at the June 30 hearing that PMC members traveled from Pennsylvania, New Jersey, and Florida to West Virginia to deliver the proceeds of the 2008 raffle to Moore. The proceeds need only have been derived from gambling in violation of the laws of any one state to establish this element of the offense as to Defendant. As in 2007, Nuss collected the raffle proceeds for the 2008 raffle for his chapter in Florida. The 2008 raffle violated Florida law in the same manner as the 2007 raffle. In April of 2008, Nuss traveled from Florida to West Virginia to deliver the proceeds of his chapter's sale of raffle tickets to Moore. That weekend coincided with a mandatory PMC event in West Virginia, meaning that the delivery of the proceeds was not the sole purpose of the travel. This is inconsequential, however, because the distribution of gambling proceeds need only have been *a*

reason for the interstate travel. *See United States v. Peskin*, 527 F.2d 71, 75 (7th Cir. 1975); *United States v. Billups*, 522 F. Supp. 935, 945 (E.D. Va. 1981). Accordingly, the second element of a Travel Act offense is satisfied as to Count Eleven.

### 3. *Subsequent distribution of the proceeds*

To satisfy the third element of a substantive Travel Act violation, there must be evidence that a person distributed, or attempted to distribute, the proceeds of the unlawful activity after the use of the interstate facility or the interstate travel. In 2007 and 2008, the raffle proceeds from Nuss's chapter in Florida were distributed to Moore in West Virginia following the use of an interstate facility and interstate travel, respectively. Thus, this element is satisfied for Counts Eight and Eleven.

### 4. *Aiding and Abetting*

Defendant is charged with aiding and abetting the substantive Travel Act violations set forth in Counts Eight and Eleven. A person is punishable as a principal if he "aids, abets, counsels, commands, induces or procures" the commission of a crime. 18 U.S.C. § 2. To be liable as an aider and abetter, the person must "in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about, . . . seek by his action to make it succeed." *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). As stated above, the record establishes that substantive Travel Act violations occurred in 2007 and 2008. Defendant, as the PMC's president, authorized the raffles. He initiated each year's raffle by procuring the raffle tickets. Defendant distributed the tickets to the other mother club members, who then distributed them to the various PMC chapters and their members. The proceeds of the raffles then flowed back up the PMC hierarchy, from the rank and file members

to the chapter presidents, to the mother club members, and ultimately to Defendant. The record is more than adequate to conclude that Defendant aided and abetted the substantive Travel Act violations.

### B. *Count Two of the Maryland Indictment*

Count Two of the Maryland indictment charges Defendant with possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d), 5845, and 5871. The Court heard testimony and proffers from counsel concerning the factual basis for this offense at the June 30 hearing.

According to the uncontested testimony of FBI Special Agent Chris Courtright, on October 6, 2009, federal law enforcement agents arrived at Defendant's home in Maryland to execute search and arrest warrants. During the search of the residence, the agents found a Streetsweeper shotgun. The Streetsweeper was not registered to Defendant, or anybody else, in the National Firearms Registration and Transfer Record. The gun was test-fired and found to be a functioning firearm.

26 U.S.C. § 5861(d) provides, in pertinent part: "It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." The term "firearm" used in § 5861(d) includes any "destructive device." 26 U.S.C. § 5845(a). A "destructive device" is defined as, among other things, any weapon with a barrel bore greater than one-half inch in diameter that can fire a projectile by the action of an explosive. 26 U.S.C. § 5845(f)(2). Shotguns which are "generally recognized as particularly suitable for sporting purposes" are excluded from the category of destructive devices. *Id*. A Streetsweeper is a twelve-gauge semi-automatic short-barrel shotgun with pistol grips, a folding stock, and a high capacity magazine. It has a barrel bore greater than one-half inch in diameter. The

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has determined that Streetweepers are not particularly suitable for sporting purposes and therefore are destructive devices within the meaning of 26 U.S.C. § 5845(f). ATF Ruling 2001-1, 66 Fed. Reg. 9748 (Feb. 9, 2001); ATF Ruling 94-2, ATF Q. Bull. 1994-1, 24.

To prove a violation of 26 U.S.C. § 5861(d), the Government bears the burden of establishing that a defendant knowingly possessed a weapon within the statutory definition of a "firearm" and that the weapon was not registered to him in the National Firearms Registration and Transfer Record. To prove knowing possession, there must be evidence the defendant "knew that the weapon he possessed had characteristics triggering the statutory duty to register it." *United States v. Jackson*, 124 F.3d 607, 610 (4th Cir. 1997) (citing *Staples v. United States*, 511 U.S. 600, 619 (1994)).

The essential elements of the offense are supported by the record. The Streetsweeper was found in Defendant's home. Defendant does not dispute that he knew he was in possession of the weapon. Defendant likewise does not contest the Government's averment that the Streetsweeper is a "firearm" within them meaning of 26 U.S.C. §§ 5845(a) and 5845(f)(2) or that the Streetsweeper was not registered to Defendant. The only unresolved question from the June 30 hearing was whether Defendant knew of the characteristics of the weapon that triggered his statutory duty to register it.

Although § 5861(d) is silent concerning the applicable mens rea requirement, the Supreme Court has held that a conviction under § 5861(d) requires proof that the defendant knew of those characteristics of the gun that make it a "firearm" as defined by the statute. *Staples v. United States*, 511 U.S. 600, 619 (1994). It is not enough that the defendant merely know he owns a firearm in the

general sense. However, in establishing the knowledge required, it is unnecessary to prove that a defendant actually measured the unlawful features or dimensions of the weapon. *See United States v. Williamson*, 170 F. App'x 889, 890 (5th Cir. 2006) (unpublished) (holding that the length of a sawed-off shotgun is readily apparent to an observer and is thus sufficient to establish knowledge by defendant). Instead, knowledge can be reasonably inferred if the unlawful characteristics of the firearm are "immediately apparent and externally visible to anyone observing it." *See United States v. Reyna*, 130 F.3d 104, 109 n.6 (5th Cir. 1997) ("'The fact that a shotgun's length is obvious and apparent is . . . a means of proving knowledge.'") (quoting *United States v. Edwards*, 90 F.3d 199, 205 (7th Cir. 1996).

The ATF found Streetsweepers to be destructive devices, and thus firearms within the meaning of the statute, because they are shotguns with a bore greater than one-half inch and because they are not generally recognized as suitable for sporting purposes. According to the ATF, the characteristics that make Streetsweepers not suitable for sporting purposes are their size, magazine capacity, and configuration—particularly the pistol grips and revolving "drum" or "barrel" magazine. ATF Ruling 94-2 ("We believe the weapon to have been specifically designed for military and law enforcement uses."). It is obvious that Streetsweepers are "military-type" shotguns. *Id*. Defendant stated at the June 30 hearing that he knew that the weapon was a twelve-gauge shotgun. Furthermore, in response to the Court's question "[D]id you know that the bore of the barrel was greater than a half an inch in size?," Defendant stated "Probably never thought about it. If someone asked me, yes." In addition, because twelve-gauge shotguns uniformly feature a bore diameter approaching one inch, knowledge that the shotgun was a twelve-gauge shotgun is

14

tantamount to knowledge that the bore exceeds one-half inch in diameter.[7] The record further reflects that Defendant was well aware of the features of the weapon. The Court has seen a photograph of the Streetsweeper, and it is apparent from simply looking at the weapon that it is unlikely to be used for sporting purposes. Although one could certainly hunt with it, that is not the impression with which one is left by its appearance. Given that the weapon's size, appearance, and function make it obviously ill-suited for sporting purposes, and that Defendant was admittedly familiar with its features, there is sufficient evidence in the record to conclude that Defendant was aware of the characteristics of the weapon that triggered the duty to register it. *See Jackson*, 124 F.3d at 615 (holding that mens rea element of § 5861(d) is satisfied where the features of the weapon bringing it within the statutory definition of firearm were "obvious" and "easily observable").

### III. CONCLUSION

For the reasons set forth above, the Court finds that there are adequate factual bases for the guilty pleas entered by Defendant to Counts Eight and Eleven of the superseding indictment and Counts One and Two of the Maryland indictment.

**IT IS SO ORDERED**.

---

[7] As evidenced by the Court's discussion of this issue with the Defendant at the plea hearing, few owners of twelve-gauge shotguns would ever actually contemplate that the bore diameter of the firearm exceeds a half inch. However, choke tubes notwithstanding, every twelve-gauge will meet the standard, and the Court finds, as a matter of law, that knowledge that one possesses a twelve-gauge shotgun is equivalent to knowledge that the bore diameter is greater than a half inch.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, and the United States Probation Office.

       ENTER:  December 20, 2010

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE